The SECURITIES AND EXCHANGE COMMISSION, Applicant,

v.

WHEELING–PITTSBURGH STEEL CORPORATION, a corporation, and Dennis J. Carney, its Chairman, President and Chief Executive Officer, Respondents.

Misc. No. 7507.

United States District Court,
W. D. Pennsylvania.

Dec. 17, 1979.

---

Richard E. Brodsky, Washington, D. C., for applicant.

Paul A. Manion, Pittsburgh, Pa., for respondents.

## OPINION

ZIEGLER, District Judge.

The Securities and Exchange Commission filed a civil enforcement action seeking to compel Wheeling-Pittsburgh Steel Corporation and Dennis J. Carney to produce evidence concerning the identity of any company or individual with whom merger or acquisition discussions were held. We decline to place the imprimatur of this court upon the activities of the Commission and, therefore, relief will be denied.

### I. History of Case

On August 17, 1979, the Securities and Exchange Commission (Commission) filed an application with this court for an enforcement order pursuant to section 21(c) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(c) (1976).[1] The Commission seeks to enforce that portion of a subpoena duces tecum dated August 2, 1979, and directed to Wheeling-Pittsburgh Steel Corporation (W–P) and its president, Dennis J. Carney (Carney), which requires respondents to disclose information that the Commission deems relevant to its investigation.

On August 27, 1979, respondents filed an answer and counterclaim advancing four distinct defenses. They are as follows: (1) The information sought is irrelevant to any legitimate inquiry by the Commission; (2) the subpoena demands confidential information and disclosure would cause irreparable harm to the company; (3) the subpoena was issued in bad faith and for the purpose of harassment; and (4) the investigation constitutes a misuse and abuse of an administrative agency by persons who oppose the grant of federal loan guarantees to W–P. As a result, respondents urge this court to enjoin the entire investigation.

The court, tracking the procedures outlined in United States v. McCarthy, 514 F.2d 368, 372–73 (3d Cir. 1975), and its progeny, United States v. Genser, 582 F.2d 292, 302 (3d Cir. 1978), conducted hearings on September 7, 13 and 14. The testimony of the witnesses[2] and the exhibits raised serious issues concerning the propriety of

1. 15 U.S.C. § 78u(c) (1976) provides:

   In case of contumacy by, or refusal to obey a subpoena issued to, any person, the Commission may invoke the aid of any court of the United States within the jurisdiction of which such investigation or proceeding is carried on, or where such person resides or carries on business, in requiring the attendance and testimony of witnesses and the production of books, papers, correspondence, memoranda, and other records. And such court may issue an order requiring such person to appear before the Commission or member or officer designated by the Commission, there to produce records, if so ordered, or to give testimony touching the matter under investigation or in question; and any failure to obey such order of the court may be punished by such court as a contempt thereof. All process in any such case may be served in the judicial district whereof such person is an inhabitant or wherever he may be found. Any person who shall, without just cause, fail or refuse to attend and testify or to answer any lawful inquiry or to produce books, papers, correspondence, memoranda, and other records, if in his power so do do, in obedience to the subpena of the Commission, shall be guilty of a misdemeanor and, upon conviction, shall be subject to a fine of not more than $1,000 or to imprisonment for a term of not more than one year, or both.

2. The court received evidence from George Raynovich, counsel for W–P, Dennis J. Carney, President and Chief Executive Officer, and Martin Aussenberg, staff attorney for the Commission, who was in charge of the investigation.

the Commission's investigation. In particular, the court was concerned with respect to the apparent abuse of the investigative process by persons opposed to the grant of federal loan guarantees to W–P, as well as the role, if any, of the agency in furthering the conduct. Accordingly, at the close of the hearing on September 14, 1979, the court granted respondents' request for discovery.[3]

The discovery order was narrowly drawn to insure that the burden on the administrative agency would be minimized as much as possible.[4] A final hearing was conducted on October 22, 1979, after completion of the authorized discovery. We now articulate the following findings of fact and conclusions of law in accordance with *United States v. McCarthy* and Fed.R.Civ.P. 52(a).

## II. *Findings of Fact*

Wheeling-Pittsburgh Steel is a Delaware corporation with offices at Pittsburgh, Pennsylvania. It is engaged in the business of manufacturing and selling steel and related products. W–P's stock is registered pursuant to section 12(b) of the Securities Exchange Act, 15 U.S.C. § 78L(b) (1976), and is listed on the New York Stock Exchange. Annual and other periodic reports are filed with the Commission pursuant to section 13(a) of the Act. 15 U.S.C. § 78m(a) (1976). Dennis J. Carney has held the position of President and Chief Executive Officer for two years.

During the preceding two years, W–P attempted to obtain loan guarantees from the Economic Development Administration (EDA) and the Farmers Home Administration (FmHA). The loans would be financed by private lenders and used to install pollution control equipment and a rail mill at Monessen, Pennsylvania. Receipt of the loan guarantees is critical to the company because the rail mill cannot be constructed without pollution control devices required by the Environmental Protection Agency which in turn cannot be financed without the loans. Three other companies—United States Steel Corporation, Bethlehem Steel Corporation and CF&I—manufacture steel rails. All have opposed the ·granting of loan guarantees to W–P. As we will explore in detail, CF&I, a company owned by Crane Company, has been particularly active in its opposition.

On December 28, 1978, and January 9, 1979, Carney received identical "Letters of Intent" from EDA and FmHA.[5] The letters stated that the agencies "will recommend" loan guarantees of $100 million (EDA) and $40 million (FmHA). The "Letters of Intent" were contingent on a number of provisions. A careful examination of these provisions reveals, however, that the conditions involved ministerial matters which offered no major obstacles to receipt of the guarantees.

On April 27, 1979, in a "Report on the Annual Meeting of Stockholders," Carney discussed the status of the loan guarantees. The language that precipitated this entire investigation is as follows:

> We obtained commitments for federal loan guarantees of $140-million, and for a $10-million direct loan through the State of Pennsylvania. These commitments will enable us to finalize financial ar-

---

**3.** The court recognizes that discovery in a subpoena enforcement action is the exception and not the rule. Further proceedings, such as discovery, are warranted only in the unique case, where a respondent is able to "make a substantial showing" that the summons is tainted. *U. S. v. McCarthy, supra* at 376. The *McCarthy* court, in setting forth guidelines for district courts to follow, stated:

> Although the proceedings are of a summary nature, if the district court concluded that it could not fairly decide the case on the record before it at the return of the order, it would be free to direct further proceedings, including discovery, if requested.

*Id.* at 373.

**4.** The court ordered that the deposition of Arthur T. Downey be taken and that Martin H. Aussenberg, the attorney in charge of the investigation, produce for inspection and copying notes or memoranda prepared contemporaneously with any discussion with Downey or Timothy Keeney. *See,* Transcript of September 14, 1979, Order ·of Court at 5–6.

**5.** The letters are attached to this Opinion as Appendixes A and B.

rangements in June through a consortium of insurance companies.[6]

Later, in the same report, Carney remarked:

We are also exploring future acquisitions being proposed to us by several domestic and foreign firms.[7]

Following the report to shareholders, Carney spoke to news reporters. He related that the turnaround in W–P's financial position had attracted domestic and foreign concerns who were interested in entering business combinations, but "so far none of them looks good."[8] According to Carney, the discussions were preliminary and did not reach the point of discussing terms.

On June 11, 1979, Carney appeared before the Subcommittee of the Committee on Appropriations of the United States Senate. He was interrogated at length by Senator Lowell Weicker of Connecticut, an opponent of the loan guarantees, concerning use of the word "commitments" in the report to shareholders.[9] The exchange between Senator Weicker and Carney reveals that the Senator believed that use of the word "commitments," in describing the status of the loan guarantees, was a material misrepresentation of fact, since the letters from EDA and FmHA were only "Letters of Intent." In Carney's opinion, the terms were synonymous and use of the word "commitments" was at most a semantical distinction.

The Senator obviously felt otherwise. On June 14, a letter from Senator Weicker was hand delivered to Stanley Sporkin, Director of the Division of Enforcement of the Commission.[10] The letter directed Sporkin's attention to Carney's use of the word "commitments" in the April 27 report, and suggested that the statement constituted a violation of Rule 10b–5. No other alleged violations were indicated.

The letter was routed from Sporkin to Richard E. Brodsky of the Division of Enforcement, who in turn assigned the case to Martin Aussenberg, a staff attorney. On June 19, Aussenberg contacted Timothy Keeney, a legislative assistant of Senator Weicker. Keeney described the loan guarantee process, advised Aussenberg of W–P's pending application, pointed out Carney's use of the word "commitments" in the April 27 report and supplied Aussenberg with a transcript of the Senate hearings.[11] Keeney also referred Aussenberg to one "Art Downey," describing him as an attorney for CF&I, a corporate competitor of W–P that was vigorously opposing the loan guarantees.

Aussenberg called Downey the same day. During the conversation, Downey suggested other areas, apart from use of the word "commitments," of suspected violation of the securities laws. Downey has testified that he told Aussenberg that CF&I was "frustrated" and "exasperated" concerning its inability to block the loan guarantees and was providing much of the information as a means of "venting my exasperation."[12]

Some information concerning the role of Arthur T. Downey is instructive. Downey

---

6. *See*, respondents' Exhibit No. 22 at 10–11.

7. *Id.* at 12.

8. Respondent's Exhibit No. 23 is an article dated April 30, 1979, which appeared in the Wall Street Journal. The article is an accurate representation of his remarks according to Carney.

9. The exchange between Carney and Senator Weicker, reprinted from the Congressional Record, *is attached to respondents' answer and counterclaim as Exhibit B.* Portions of the exchange also appear in respondents' Exhibit No. 11.

10. The letter is attached to this Opinion as Appendix C.

11. See, respondents' Exhibit No. 11.

12. Deposition of Arthur T. Downey at 192, 193, and 195. The activity of CF&I in opposing the loan guarantees was not limited to its use of the SEC. On two occasions, Paul R. Hundt, general counsel of Crane Corporation, called David M. Irwin, counsel for the insurance company lenders, to advise of plans to file a lawsuit to block the loan guarantees. In the second call, Hundt asked Irwin to disclose confidential information by asking what action the lenders intended to take in the light of the lawsuit. *See* respondents' Exhibit No. 16.

is an attorney practicing in Washington, D. C. He was retained by Paul R. Hundt, general counsel for Crane Co. and CF&I, to direct CF&I's efforts to block the grant of guarantees to W–P. As early as February of 1979, Downey had contacts with members of Senator Weicker's staff, Timothy Keeney and Peter Goldfarb. Since that time, he has spoken to Keeney approximately 10 to 20 times on the subject of the loan guarantees to W–P, but prepared no notes of any conversation. As a result, his deposition is replete with instances of professed inability to recall critical but recent events.[13]

The deposition does reveal, however, that Downey and Keeney joined forces to block the loan guarantees to W–P and, when their efforts appeared doomed in a political forum, they began using the investigative authority of the Securities and Exchange Commission to achieve a political result. More importantly the Downey deposition, when considered with additional evidence of record, discloses that the Commission was aware that it was being used, and did nothing to prevent the abuse of its process.

All doubts concerning manipulation were resolved shortly after Aussenberg's initial contacts with Kenney and Downey. On June 21, 1979, Senator Weicker introduced ten amendments relating to W–P to the Supplemental Appropriations Bill for the EDA.[14] Amendment No. 273 provided:

> None of the funds provided in this Act shall be available for a new loan or guarantee under the Economic Development Revolving Fund to any corporation which

is the subject of an investigation by the Securities and Exchange Commission.[15]

Prior to the introduction of this amendment, Keeney telephoned Aussenberg on two occasions. In the first call, Keeney inquired of the status of the investigation.[16] In the second call, Kenney advised Aussenberg that Weicker was considering introducing the amendment.[17] Aussenberg testified that he objected to Weicker's amendment; however, the amendment was introduced and, despite knowledge of this fact, the contacts between Aussenberg, Downey and Keeney continued.[18]

On June 25, Aussenberg called counsel for W–P to request production of certain documents. This was the first notice to W–P of any investigation. On July 2, George Raynovich, counsel for W–P, supplied numerous documents to the Commission.[19]

On July 31, the Commission issued its formal order directing a private investigation and designating officers to take testimony pursuant to section 21(a) of the Act, 15 U.S.C. § 78u(a).[20] The order stated that members of the staff had reported information tending to show that W–P had disseminated "untrue statements of material fact and omitted to state material facts," concerning: (1) federal loan guarantees; (2) loans, line of credit and other sources of financing; (3) possible acquisition of other persons by W–P or of W–P; and (4) trading in W–P stock.

On Wednesday, August 1, 1979, Aussenberg notified Raynovich that the Commission desired to depose Carney as soon as

---

**13.** Respondents' brief of October 19 details 37 instances in which Downey is unable to recall critical events. *See* respondents' brief of October 19, Appendix B. The discovery value of the deposition is also hindered by the frequent and ofttimes frivolous objections of counsel for the Commission and Downey's counsel.

**14.** *See* respondents' Exhibit Nos. 1–10. A vote was taken only on the first amendment. The others were placed in consideration but no vote was taken.

**15.** This amendment is attached to this Opinion as Appendix D.

**16.** *See* Record at 248.

**17.** *See* Record at 243–247.

**18.** Aussenberg had at least one further conversation with Downey and three others with Keeney. *See* Record at 268, 273, 285 and 353.

**19.** A letter setting forth the documents that W–P supplied to the SEC is attached to this Opinion as Appendix E.

**20.** *See* In the Matter of Wheeling-Pittsburgh Steel Corporation, File No. HO–1175.

possible.[21] Raynovich responded that Carney would be without the city for one week. Aussenberg refused to delay and Raynovich agreed to produce Carney for the deposition on Friday, August 3.[22]

A subpoena *duces tecum* was issued on August 2, 1979,[23] and the deposition proceeded the next day. Aussenberg's inquiries focused primarily on the loan guarantee process, particularly Carney's use of the word "commitments" in the Report of April 27. Carney answered all questions relating to the loan guarantees and the Commission does not contend otherwise. However, during a final phase of the deposition, Aussenberg instructed Carney to disclose the name of every company that had approached him, or he had approached since January of 1979, concerning possible acquisition by or of W–P.[24] Carney refused to divulge names or turn over any documents pertaining to such discussions, and the instant action followed.

### III. *Discussion*

Respondents assert four defenses to the application for enforcement of the subpoena. They are: (1) the information is irrelevant to any legitimate inquiry; (2) the subpoena demands privileged and confidential information and disclosure would cause W–P irreparable harm; (3) the subpoena was issued in bad faith and for the purpose of administrative harassment; and (4) the investigation constitutes a misuse and abuse of the Commission by persons who oppose the grant of federal loan guarantees to W–P.

Before we examine these contentions in detail, some general observations must be made. The Securities and Exchange Commission is statutorily authorized to "make such investigations as it deems necessary to determine whether any person has violated, is violating, or is about to violate" the federal securities laws or "the rules or regulations thereunder." 15 U.S.C. § 78u(a) (1976). In furtherance of that purpose, the Commission "is empowered to . . . require the production of any books, papers, correspondence, memoranda, or other records which the Commission deems relevant or material to the inquiry." *Id.* at § 78u(b). In the event of disobedience, the Commission may apply to a district court for compliance. *Id.* at § 78u(c); *see SEC v. Arthur Young & Co.*, 190 U.S.App.D.C. 37, 41–2, 584 F.2d 1018, 1022–23 (D.C.Cir.1978).

■ There are limits, however, on the power to subpoena. The inquiry must be for a proper purpose, the information sought must be relevant to that purpose and statutory procedures must be observed. *United States v. Powell*, 379 U.S. 48, 58, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964). In addition, a district court "has a broad power of inquiry to ensure that its process is not abused . . . ." *SEC v. Howatt*, 525 F.2d 226, 229 (1st Cir. 1975). As the Supreme Court stated in *United States v. Powell*:

It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused. Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any oth-

---

**21.** Depositions taken by the SEC for investigative purposes are known as "Investigative Testimony."

**22.** Record at 127.

**23.** The subpoena *duces tecum* is attached to this Opinion as Appendix F.

**24.** Respondents' Exhibit No. 17 is a certified copy of the Carney deposition. At p. 128 Aussenberg inquires:

Mr. Carney, I am going to ask you to give me the name of every company that has approached you in Wheeling-Pittsburgh about the possibility of acquiring them since January of this year; and I am going to ask you for the names of every company that you have approached about the possibility of being acquired since January of this year; and I am going to ask you to produce every record in your possession or in the possession of Wheeling-Pittsburgh Steel that relates to any of those meetings, contacts or discussion.

. . . .

er purpose reflecting on the good faith of the particular investigation.

379 U.S. at 58, 85 S.Ct. at 255.

■ Respondents argue that use of the word "commitments" and statements concerning acquisitions could not possibly constitute violations of Rule 10b–5.[25] However, whether certain conduct violates the securities laws should not be decided in a subpoena enforcement action. *See Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509, 63 S.Ct. 339, 87 L.Ed. 424 (1943); *SEC v. Brigadoon Scotch Dist. Co.*, 480 F.2d 1047, 1052–53 (2d Cir. 1973). Moreover, the Commission is not required to limit its investigations to persons against whom "probable" or even "reasonable" cause has been established. *SEC v. Howatt, supra* at 229. The SEC has a power of "original inquiry." *Id.* citing *United States v. Morton Salt*, 338 U.S. 632, 642, 70 S.Ct. 357, 94 L.Ed. 401 (1950). Thus, we cannot and will not adjudge whether Carney's statements may be violative of the securities laws, and therefore we turn to the defenses raised by respondents.

#### A. *Relevancy*

■ Subpoenaed documents or testimony are relevant unless they are "plainly incompetent or irrelevant for any lawful purpose." *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509, 63 S.Ct. 339, 343, 87 L.Ed. 424 (1943). And the trend of recent cases admits an inquiry to the extent necessary to effectuate the investigative power of the agency. *SEC v. Arthur Young & Co., supra*, 190 U.S.App.D.C. at 49, 584 F.2d at 1030.

■ In the instant case, the Commission contends the information and materials which it is seeking are relevant for two distinct and lawful purposes: (1) if Carney's statements in the April 27 report or to the news media, concerning discussions of acquisitions were false or misleading, such statements may constitute material misrepresentations under Rule 10b–5; and (2) there was heavy trading in W–P stock prior to Carney's statements,[26] and the traders may have possessed information relating to potential combinations between W–P and another entity. If this information was not generally available to the public, such trading may constitute a violation of Rule 10b–5. Moreover, even if respondents did not buy or sell stock during the period in question, they may be liable as "tippers." *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228 (2d Cir. 1974). Thus, the names of persons with whom Carney had discussions is necessary to determine: (1) whether material nonpublic information relating to W–P was exchanged; (2) who possessed such information; and (3) whether these persons traded in W–P stock.

Respondents rejoin that the Commission can obtain such information from other sources. They note the agency maintains a market surveillance staff that investigates any unusual activity in listed stocks and, therefore, the traders who purchased or sold W–P stock should be interrogated. We disagree.

Without disclosure of the names of the persons with whom Carney spoke, the agency would be forced to interrogate or depose every trader. Such an approach is impractical and unreasonable. Accordingly, the claim of respondents that the information is irrelevant is rejected.

#### B. *Confidentiality*

Respondents next contend that the information sought is privileged and confidential

---

**25.** Rule 10b–5, 17 CFR 240.10b–5 provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, (1) to employ any devise, scheme, or artifice to defraud, (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

**26.** *See* Brief of the SEC of September 4, 1979, at n. 10.

and disclosure would cause irreparable harm to the company. This contention is without merit.

■ In *FCC v. Schreiber,* 381 U.S. 279, 295–96, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965), the Supreme Court held that a claim of confidentiality is premature and improper until the subpoenaed information has been made available to the agency and an opportunity exists to rule on specific requests for confidential treatment. As the court in *FTC v. Texaco,* 180 U.S.App.D.C. 390, 555 F.2d 862 (D.C.Cir.), *cert. denied,* 434 U.S. 883, 98 S.Ct. 250, 54 L.Ed.2d 168 (1977) observed, "it is the agencies, not the courts, which should, in the first instance, establish the procedures for safeguarding confidentiality." *Id.,* 180 U.S.App.D.C. at 412 n. 62, 555 F.2d at 884 n. 62. Moreover, W–P has failed to establish that disclosure of these names will, in Carney's words, "kill the deal." The mere suggestion of possible damage is not sufficient to block an authorized inquiry into relevant matters. *SEC v. Brigadoon Scotch Dist. Co.,* 480 F.2d 1047, 1056 (2d Cir. 1973).

■ If the information is in fact confidential, it will be exempt from disclosure under the Freedom of Information Act, 5 U.S.C. § 552 (1976). The Commission has offered to provide 10 days notice prior to release of any information, if a request is received and a determination is made that the material is not exempt and must be disclosed. Several courts have found such protections to be adequate and we are satisfied respondents will suffer no harm. *See, e. g., SEC v. Dresser Industries, Inc.,* 453 F.Supp. 573, 576 (D.D.C.1978), *aff'd* Nos. 78–1702, 78–1705 (D.C.Cir. Nov. 19, 1979); *FTC v. Texaco, supra,* 180 U.S.App.D.C. at 412, 555 F.2d at 884.

**C. *Bad Faith and Harassment***

■ If the instant subpoena was issued "for an improper purpose, such as to harass . . . or for any other purpose reflecting on the good faith of the particular investigation," it is unenforceable. *U. S. v. Powell, supra,* 379 U.S. at 58, 85 S.Ct. at 255. The *Powell* standard is equally applicable to enforcement proceedings instituted by the Commission. *SEC v. Arthur Young & Co., supra,* 190 U.S.App.D.C. 43 n. 39, 584 F.2d at 1024 n. 39.

■ Respondents' primary contention throughout these proceedings relates to the alleged abuse of the investigative process of an executive agency by third-persons. Although it is claimed that the agency's motivations were also improper, there is no substantial evidence of record to support the contention. The burden, when allegations of bad faith and harassment are made, is a "heavy one." *United States v. LaSalle National Bank,* 437 U.S. 298, 316, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978). That burden has not been met in this case.[27]

**D. *Abuse of the Investigative Process***

Respondents contend the evidence establishes that the investigative process of the Commission has been used by a competitor and a United States Senator and his staff, not for the purpose of vindicating claimed violations of federal law, but for the collateral purpose of blocking the consummation of federal loan guarantees and loans from private lenders to W–P. On the other hand, the agency asserts "the motivations of persons with whom the SEC has had contact concerning the investigation . . . are simply irrelevant to a determination of whether the Commission acted in good faith in this matter."[28]

The starting point of our analysis must again be *United States v. Powell, supra.* The Court stated:

that the SEC's tactics during this investigation have often been heavy-handed, excessive and arrogant.

---

27. Our holding in this regard should not be construed as an endorsement of the Commission's use of authority in this case. While we are mindful that it is not the role of the judiciary to intrude into the functions of an investigative agency, we feel compelled to observe

28. *See* SEC Brief of October 31, 1979, at 2–3.

It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused. Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation.

379 U.S. at 58, 85 S.Ct. at 255.

We do not question the limited function of a district court in a proceeding to enforce an administrative subpoena. On the other hand, the judiciary must not function as a rubber-stamp and accede to every request regardless of the circumstances. As Justice Frankfurter explicated:

Instead of authorizing agencies to enforce their subpoenas, Congress has required them to resort to the courts for enforcement. In the discharge of that duty courts act as courts and not as administrative adjuncts.

*Penfield Co. of California v. SEC*, 330 U.S. 585, 604, 67 S.Ct. 918, 928, 91 L.Ed. 1117 (1947) (dissenting opinion). Judge Wilkey's remarks in *FTC v. Texaco, supra* are also apposite:

There are limits to the subpoena power of an administrative agency, and the duty and authority to enforce those limits rests on our federal district courts. As the Ninth Circuit has stated,

There is no rule requiring a court to act against conscience. The proceeding [judicial enforcement of administrative subpoenas] is equitable in character. Equitable considerations should prevail. There is no power to compel a court to rubber-stamp action of an administrative agency simply because the latter demands such action.

*F. T. C. v. Texaco, Inc., supra*, 180 U.S.App. D.C. at 431, 555 F.2d at 903, *citing Chapman v. Maren Elwood College*, 225 F.2d 230, 234 (9th Cir. 1955).

As one might expect, the case law is sparse. Some guidance is available. In *United States v. Fensterwald*, 180 U.S.App. D.C. 86, 553 F.2d 231 (D.C.Cir.1977), the taxpayer sought to quash an I.R.S. summons. However, an attempt to initiate discovery by filing interrogatories directed to the agency was denied by the district court. On appeal, the Court of Appeals for the District of Columbia reversed and stated:

The factual allegations of appellant Fensterwald here have taken him out of the class of the ordinary taxpayer, whose efforts at seeking discovery would, if allowed universally, obviously be too burdensome to the Internal Revenue Service.

180 U.S.App.D.C. at 86–87, 553 F.2d at 231–32.

Fensterwald, an attorney, had represented James McCord and James Earl Ray. He alleged that representation of these men "led to an extraordinary interest" in him by certain persons in the executive branch and that "such persons . . . were possessed of sufficient power to stir an interest" by the Internal Revenue Service. *Id.*, 180 U.S.App.D.C. at 87, 553 F.2d at 232. Under such circumstances, the court held that some discovery was required to determine "how taxpayer Fensterwald's name was selected for this audit." *Id.*, 180 U.S. App.D.C. at 88, 553 F.2d at 232–33.

The teaching is clear. If discovery revealed that Fensterwald was selected for audit due to pressures from the executive branch, the court would quash the summons.

In *Center on Corporate Responsibility v. Schultz*, 368 F.Supp. 863 (D.D.C.1973), the plaintiff sought a refund from the I.R.S. claiming to be a tax-exempt organization, and also a tax-exempt status ruling. The court found "unmistakable" evidence of "political intervention" in the decision to deny tax-exempt status. *Id.* at 871. The intervention consisted of pressures from John Dean, Patrick Buchanan, and other members of the White House staff. The court concluded:

A looming issue in this case has been whether political interference or intrusion has played a role in the Internal Revenue Service's consideration of the Plaintiff's exemption application. Should this spec-

ter prove to have substance, the complexion of this case changes. A showing of political influence renders the Service's ruling null and void. It is outside the law.

*Id.* at 871.

The decision was noted in a subpoena enforcement context in *United States v. Church of Scientology*, 520 F.2d 818 (9th Cir. 1975). In that case, the Church appealed the district court's decision enforcing an I.R.S. subpoena and refusing to conduct a hearing or allow discovery relative to the claim of harassment. Relying in part on *United States v. McCarthy*, 514 F.2d 368 (3d Cir. 1975), the court remanded for a hearing on the allegations. 520 F.2d at 824. In so doing, the court stated:

In short, we agree with the district court that the allegations of harassment and improper purposes were not supported by the record and standing alone did not require the court to deny enforcement. However, our inquiry does not end here, for it may be that the Church's allegations have more substance than meets the eye. *See, e. g., Center on Corporate Responsibility, Inc. v. Schultz*, D.D.C., 1973, 368 F.Supp. 863 (evidence of White House use of IRS administrative actions against certain 'activist' organizations whose views were offensive to the White House.)

*Id.* at 823. It is clear that, if harassment for political reasons was proved, enforcement would be denied.[29]

In the instant case, the Commission, in arguing that the motivations of its sources are totally irrelevant, attempts to distinguish these authorities. First, it notes that Weicker's letter referred to a specific violation of the law and the staff conducted an

inquiry for over one month prior to the formal order.[30] Secondly, it contends that any rule which prevents a law enforcement agency from utilizing biased sources would severely impede legitimate law enforcement efforts.[31]

The first argument is vacuous. The holdings of these cases do not turn on whether there was substance to the charges proferred by the executive branch. The mischief, which the courts sought to address, was the exertion of pressure by the executive over an agency in order to compel a response.

We agree, of course, that adoption of a rule which bars an agency from pursuing an investigation predicated on a biased source is unsound. However, we reject the proposition that the motivations and actions of third-persons are totally irrelevant when an agency seeks judicial enforcement of a subpoena. *Fensterwald, Center on Corporate Responsibility* and *Church of Scientology* reflect the concern of the judiciary that an administrative agency pursue its statutory mandate in an independent and apolitical manner, with a modicum of sophistication, and free from extraneous influences or other unworthy considerations.

In our view, the Commission owes a duty to the public, who are its clients, to disassociate itself from persons who are knowingly abusing its process. While we do not suggest that the agency adopted the motives of the third-parties, the totality of the circumstances here presented creates the appearance of a partnership between the Commission and these persons. Wittingly or not, the agency has permitted, and at times encouraged, the abuse of its investigating function. This court will not com-

---

29. Respondents cite several other cases in their brief which, in their judgment, constitute authority for the proposition that abuse of an agency's process by third-persons is grounds to deny enforcement. *See, e. g., Gulf Oil Corp. v. FPC*, 563 F.2d 588, 610–11 (3d Cir. 1977); *Pillsbury Co. v. F. T. C.*, 354 F.2d 952, 964 (5th Cir. 1966); *D.C. Federation of Civic Associations v. Volpe*, 148 U.S.App.D.C. 207, 459 F.2d 123 (D.C.Cir.) *cert. denied*, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972). While these cases

reveal judicial concern over legislative interference with the administrative process, they all involve adjudicative functions. Accordingly, they turn on considerations of due process or statutory interpretation. Those considerations are not directly relevant to the case at bar.

30. *See* Record at 449.

31. *See* SEC Brief of October 31, 1979, at 18–21.

pound the gross lack of judgment by sanctioning such abuse.

■ We emphasize that we are not condemning, per se, contact between legislators and the Commission. Rather, we hold only that under the circumstances of this case, this court cannot affix its imprimatur to either the abuse of process by third-persons or, more importantly, the Commission's response to that abuse. Congress, by requiring the SEC to request judicial enforcement of its subpoenas, could not have intended such a result.

With these principles in mind, it is important to reexamine the particular facts of the case. The agency knew its original source, Senator Weicker, was a staunch opponent of loan guarantees. On June 19, Aussenberg called Weicker's legislative assistant, Timothy Keeney, in response to Weicker's letter. Keeney supplied Aussenberg with information and material relating to Carney's use of the word "commitments" in the April 27 report. Thus, Aussenberg learned from Kenney that Weicker's allegations against W–P were grounded on a technical, almost semantical misstatement in the Report to Shareholders. While we cannot and will not assess the merits of the allegations in these proceedings, the trivial nature of the original charges against respondents is relevant to our assessment of the agency's conduct. In our judgment, any reasonable individual presented with a charge that Carney violated Rule 10b–5 by use of the word "commitments" instead of "Letters of Intent," would conclude that under these circumstances, the charge was patently frivolous.

Keeney next supplied Aussenberg with the name of Arthur T. Downey. He told Aussenberg that Downey represented CF&I, a competitor of W–P, who was fighting the loan guarantees. At this time, Aussenberg should have recognized that Keeney and Downey had pooled their efforts in an attempt to block the loan guarantees. Nevertheless, Aussenberg immediately called Downey. During the conversation,

Downey informed Aussenberg that his client, CF&I, was "frustrated" by its inability to prevent the grant of the loan guarantees, and the information was offered to "vent" his "exasperation."

Certainly Aussenberg then knew that the SEC was being used. The events that followed only confirmed the fact. Shortly after June 19, Aussenberg received two phone calls from Kenney. In the first call, Keeney inquired of the status of the investigation. In the second, Keeney advised that Senator Weicker was considering the introduction of an amendment in the Senate of the United States barring loan guarantees to companies under investigation by the Commission. Aussenberg objected to the amendment, yet Weicker introduced it anyway. Under these circumstances, it must have been apparent to Aussenberg that Keeney's telephone calls were a means of confirming the existence of the investigation, so that Weicker's amendment would have a basis in fact.

Despite the overwhelming evidence that the administrative role was being subverted, the SEC continued to utilize Keeney and Downey as sources for the record establishes that Aussenberg had three further conversations with Keeney and one with Downey.[32]

It is also significant that from the time W–P learned of the SEC's inquiry on June 25, it cooperated to the fullest extent possible. On July 2, the company voluntarily turned over numerous documents.[33] The President and Chief Executive Officer was produced for a deposition within 48 hours of demand. Finally, W–P's general counsel, Mr. Raynovich agreed during the August 3 deposition to submit to a deposition on August 6. Thus, the SEC was not confronted with a recalcitrant party who was seeking to hinder its investigation.

Throughout these proceedings, the Commission has reminded this court that our function is not to advise the agency concerning the enforcement of federal law.

---

**32.** Record at 268, 273, 285 and 353.

**33.** *See* Appendix E.

We agree that Congress has indeed granted that authority to the SEC. However, Congress also requires judicial approbation of enforcement actions. In our judgment, under the totality of the circumstances here presented, to enforce this subpoena would be "permit[ting] [our] process to be abused." *United States v. Powell, supra,* 379 U.S. at 58, 85 S.Ct. 248. Accordingly, the request for enforcement of the subpoena must be denied.[34]

An appropriate order will follow.

## APPENDIX A

### [SEAL] UNITED STATES DEPART-MENT OF COMMERCE

Economic Development Administration

Washington, D.C. 20230

Mr. Dennis J. Carney
Chairman
Wheeling-Pittsburgh Steel Corp.
Four Gateway Plaza
P.O. Box 118
Pittsburgh, Pennsylvania 15230

Dear Mr. Carney:

As a result of recent meetings between representatives of Wheeling-Pittsburgh Steel Corporation (Wheeling-Pitt) and the staff of our Office of Business Development, and on the basis of our preliminary review of the application submitted to the Economic Development Administration (EDA), we have determined that we will recommend to the Assistant Secretary for Economic Development that he give favorable consideration to a 90% EDA guaranty of not greater than $100 million in fixed asset financing to be made by lenders to Wheeling-Pitt. The proceeds from this financing would be used strictly for the purposes specified in your application which we understand will result in the preservation of over 15,000 jobs corporate-wide in the West Virginia, Pennsylvania and Ohio tri-state area, and enable the company's steel manufacturing and related facilities to be in compliance with all applicable Federal and state environmental regulations as well as permit the construction and equipping of a modern rail mill in Monessen, Pennsylvania.

This letter of intent will be in effect until February 15, 1979, and is subject to the satisfaction of the following contingent provisions:

1. EDA's determination that the statutory requirements of the Public Works and Economic Development Act of 1968, as amended, P.L. 89–136; 42 U.S.C. 3121 et seq., other applicable statutes and all EDA directives, rules and regulations, including but not limited to, Part 306, Business Development Program, CFR Title 13, Chapter III, have been complied with.

2. Evidence of a concluded agreement between Wheeling-Pitt and the Environmental Protection Agency on a program of pollution control measures with the documented acceptance of the pertinent environmental authorities in the states of Ohio, West Virginia and Pennsylvania, confirming that Wheeling-Pitt has complied with, or will comply with, all Federal, state and local environmental laws and regulations in effect at the time of the EDA Loan Guaranty as a result of the implementation of the project financing related to the company's corporate-wide pollution abatement program.

3. Commitment by the Farmers Home Administration (FmHA) of the U.S. Department of Agriculture to participate in the project financing of the proposed Monessen, Pennsylvania, rail mill in the form of a 90% guaranty of loans to Wheeling-Pitt of $40 million on terms and conditions satisfactory to EDA.

4. Commitment by the Middle Monongahela Industrial Development Association, Inc. (MIDA) to participate in the project financing of the proposed Monessen, Pennsylvania, rail mill in the

---

34. Respondents' counterclaim requesting an injunction enjoining the entire investigation must be dismissed. Administrative proceedings should not be enjoined even when agency bias is alleged. *First Jersey Securities, Inc. v. Bergen,* 605 F.2d 690 at 695 (3d Cir., 1979).

form of a $10 million direct loan to Wheeling-Pitt, subordinated in payment and in collateral security to all EDA and FmHA guaranteed financing and on terms and conditions satisfactory to both agencies.

5. Identification of, and firm commitments from, all private sector financial lender participants in the project financing to include EDA and FmHA related debt capitalization (and also include possible restructuring of existing institutional lender financing extended to the company as deemed appropriate), and equity capitalization required in the Agency's view, to insure the successful implementation of Wheeling-Pitt's modernization and pollution abatement programs. Of particular importance in this vein, is substantiation of adequate financing under terms and conditions acceptable to EDA that will provide Wheeling-Pitt the required operating capital necessary to ensure the company's capability of meeting its day-to-day operating needs with minimal financial disruption, thereby ensuring its viability.

6. Satisfaction by Wheeling-Pitt of the fifteen (15%) percent equity capital requirements that pertain to total required project financing.

7. A financial structure which permits the EDA 90% guaranteed exposure the best collateral security position obtainable considering the nature and covenants of existing and proposed credit facilities to Wheeling-Pitt.

8. Submission by the lender or lenders of acceptable loan agreement(s) with respect to the $100 million EDA guaranteed financing.

9. Agreement between EDA, the lending institution(s) and Wheeling-Pitt on a definitive Guaranty Agreement and General Terms and Conditions and a Loan Agreement in respect to the EDA guaranteed financing containing such terms and conditions, which, in the opinion of EDA, are necessary to protect EDA's exposure and ensure the successful achievement of project objectives.

10. Submission by financial participants involved in non-Federal related debt and/or equity financing to the company of legal documentation evidencing terms and conditions of their respective participations acceptable to EDA.

You should understand that any financial commitments or other obligations incurred by any party prior to the execution of a Guaranty Agreement by EDA are entirely at the risk of such party.

Should you have any questions regarding this letter, please do not hesitate to call at your earliest convenience.

Sincerely,

/s/ George T. Karras
Deputy Assistant Secretary
for Operations

## APPENDIX B

## UNITED STATES DEPARTMENT OF AGRICULTURE

## FARMERS HOME ADMINISTRATION

### WASHINGTON, D. C. 20250

Mr. Dennis J. Carney
Chairman
Wheeling-Pittsburgh Steel Corporation
Four Gateway Plaza
Post Office Box 118
Pittsburgh, PA 15230

Dear Mr. Carney:

As a result of recent meetings between representatives of Wheeling-Pittsburgh Steel Corporation (Wheeling-Pitt) and the staff of our Office of Business and Industry and on the basis of our preliminary review of the application submitted to the Farmers Home Administration (FmHA), we have determined that we will recommend to the Assistant Secretary for Rural Development that he give favorable consideration to a 90 percent FmHA guaranty of not greater than $40 million in fixed asset financing to be made by lenders to Wheeling-Pitt. The proceeds from this financing would be used strictly for the purposes specified in your

application which will permit the construction and equipping of a modern rail mill in Monessen, Pennsylvania.

We understand this project together with the Economic Development Administration (EDA) financing of $100 million will result in the preservation of over 15,000 jobs corporate-wide in the West Virginia, Pennsylvania and Ohio Tri-state area, and enable the company's steel manufacturing and related facilities to be in compliance with all applicable Federal and State environmental regulations.

This letter of intent will be in effect until February 15, 1979, and is subject to the satisfaction of the following contingent provisions:

1.  FmHA's determination that the statutory requirements of the Rural Development Act of 1972, as amended, other applicable statutes and all FmHA regulations have been complied with.

2.  Evidence of a concluded agreement between Wheeling-Pitt and the Environmental Protection Agency on a program of pollution control measures with the documented acceptance of the pertinent environmental authorities in the States of Ohio, West Virginia and Pennsylvania, confirming that Wheeling-Pitt has complied with, or will comply with, all Federal, State and local environmental laws and regulations in effect at the time of the FmHA loan Guaranty as a result of the implementation of the project financing related to the company's corporate-wide pollution abatement program.

3.  Commitment by the Economic Development Administration of the U.S. Department of Commerce to participate in the project financing in the form of a 90 percent guaranty of loans to Wheeling-Pitt of $100 million on terms and conditions satisfactory to FmHA.

4.  Commitment by the Middle Monongahela Industrial Development Association, Inc., (MIDA) to participate in the project financing of the proposed Monessen, Pennsylvania, rail mill in the form of a $10 million direct loan to Wheeling-Pitt, subordinated in payment and in collateral security to all EDA and FmHA guaranteed financing and on terms and conditions satisfactory to both agencies.

5.  Identification of, and firm commitments from, all private sector financial lender participants in the project financing to include EDA and FmHA related debt capitalization (and also include possible restructuring of existing institutional lender financing extended to the company, as deemed appropriate), and equity capitalization required in the Agency's view, to ensure the successful implementation of Wheeling-Pitt's modernization and pollution abatement programs. Of particular importance in this vein is substantiation of adequate financing under terms and conditions acceptable to FmHA that will provide Wheeling-Pitt the required operating capital necessary to ensure the company's capability of meeting its day-to-day operating needs with minimal financial disruption, thereby ensuring its viability.

6.  Satisfaction by Wheeling-Pitt of the fifteen percent equity capital requirements that pertain to total required project financing.

7.  A financial structure which permits the FmHA 90 percent guaranteed exposure the best collateral security position obtainable considering the nature and covenants of existing and proposed credit facilities to Wheeling-Pitt.

8.  Submission by the lender or lenders of acceptable loan agreement(s) with respect to the $40 million FmHA guaranteed financing.

9.  Agreement between FmHA, the lending institution(s) and Wheeling-Pitt on a definitive Loan Agreement and General Terms and Conditions in respect to the FmHA guaranteed financing containing such terms and conditions, which, in the opinion of FmHA, are necessary to protect FmHA's exposure

and ensure the successful achievement of project objectives.

10. Submission by financial participants involved in non-Federal related debt and/or equity financing to the company of legal documentation evidencing terms and conditions of their respective participations acceptable to FmHA.

You should understand that any financial commitments or other obligations incurred by any party prior to the execution of a Guaranty Agreement by FmHA are entirely at the risk of such party.

Should you have any questions regarding this letter, please do not hesitate to call at your earliest convenience.

Sincerely,

/s/ GORDON CAVANAUGH
Administrator
Farmers Home Administration

## APPENDIX C

United States Senate

### COMMITTEE ON APPROPRIATIONS

### WASHINGTON, D.C. 20510

June 14, 1979

BY HAND

Stanley Sporkin, Esq.
Director
Division of Enforcement
Securities and Exchange Commission
500 North Capitol Street
Washington, D. C. 20549

Dear Mr. Sporkin:

This past Monday, June 11, the State, Justice, Commerce Appropriations Subcommittee conducted a hearing on the Economic Development Agency's steel loan guarantee program with the principal witness being Dennis Carney, President of the Wheeling-Pittsburgh Steel Corporation. EDA is currently studying Wheeling-Pittsburgh's application for a $100 million loan guarantee, and expects to have an answer by July.

During the hearing the following facts were elicited:

1. Wheeling-Pittsburgh's Quarterly Statement, dated March 31, 1979, announces to stockholders in bold letters, "WE HAVE OBTAINED COMMITMENTS FOR FEDERAL LOAN GUARANTEES OF $140 MILLION." At that time, the Farmers Home Administration, which was being asked for a $40 million guarantee, had not even received the application. (see attached copy)

2. EDA acknowledged that the following statement was attached to each letter of intent sent to Wheeling-Pittsburgh: "You should understand that any financial commitments or other obligations incurred by any party prior to the execution of a Guaranty Agreement by EDA are entirely at the risk of such party." EDA stated that the intent of this was to make very clear that there had been no final commitment made by EDA.

3. The price of Wheeling-Pittsburgh's stock has doubled in the past seven months.

In light of Section 10(B) of the Securities Act of 1934 and under Rule 10(b)(5) which regulates the use of manipulation and deceptive devices in connection with a sale or purchase of securities, I felt that it was important to bring these facts to your immediate attention.

I would appreciate receiving a response at your earliest convenience. Should you have any questions, please contact Tim Keeney of my staff at 224–4041.

With warmest regards,

Sincerely,

/s/ Lowell Weicker, Jr.
United States Senator

LW:tk

cc: Harold Williams, Chairman
Securities and Exchange Commission

APPENDIX D

**Purpose:**

To provide that a loan or guarantee may not be made under the Economic Development Revolving Fund to any company under investigation by the Securities and Exchange Commission.

**Calendar No. 239**

**Amdt. No. 273**

96TH CONGRESS
1ST SESSION

# H.R. 4289

IN THE SENATE OF THE UNITED STATES

JUNE 21, 1979

Ordered to lie on the table and to be printed

# AMENDMENT

Intended to be proposed by Mr. WEICKER to H.R. 4289, an Act making supplemental appropriations for the fiscal year ending September 30, 1979, and for other purposes, viz: On page 50, between lines 5 and 6, insert the following:

None of the funds provided in this Act shall be available for a new loan or guarantee under the Economic Development Revolving Fund to any corporation which is the subject of an investigation by the Securities and Exchange Commission.

APPENDIX E

**Wheeling Pittsburgh**
STEEL CORPORATION

July 2, 1979

GEORGE RAYNOVICH JR
GENERAL COUNSEL AND SECRETARY

Martin H. Aussenberg, Esq.
Special Counsel
Division of Enforcement
Securities and Exchange Commission
500 North Capitol Street, N.W.
Washington, D. C. 20549

Re: Wheeling-Pittsburgh Steel Corporation Request for Documents

Dear Mr. Aussenberg:

In response to your letter of June 25, 1979 addressed to Mr. Gill, we provide the following documents:

1.(a)—Letter of Intent from the United States Department of Commerce, Economic Development Administration, dated December 28, 1978, February 12, 1979 and April 5, 1979.

—Letter of Intent from the United States Department of Agriculture, Farmers Home Administration dated January 9, 1979.

—Letter dated April 11, 1979 from J. W. Fleming II, counsel for Wheeling-Pittsburgh Steel Corporation, to Mr. Dwight Reeves, Loan Specialist for the Farmers Home Administration.

—Letter from the Pennsylvania Department of Commerce to the Middle Monongahela Industrial Development Association, Inc., dated January 29, 1979.

—Letter from the Pennsylvania Department of Commerce to the Middle Monongahela Industrial Development Association, Inc., dated April 5, 1979.

—Transcript of proceedings before the Senate Subcommittee of the Committee on Appropriations of June 11, 1979.

1.(b)—Letter from Mellon Bank N.A. to A. Richard Rosavage, dated September 11, 1978.

—Letter from Pittsburgh National Bank to A. Richard Rosavage, dated September 13, 1978.

2.—Press Release dated June 20, 1979.

—Fact Sheet about new rail mill and pollution control.

—Press Release dated June 12, 1979 (Wheeling Rotary Club).

—Press Release dated June 12, 1979 (Middle Monongahela Industrial Development Association, Inc.).

—Press Release dated May 4, 1979.

—Fact Sheet for Rails dated March 27, 1979.

—Press Release dated March 27, 1979.

—Press Release dated December 28, 1978.

—Letter to Employees and Shareholders dated December 15, 1978 with attached Year-End News Bulletin.

—Speech by Dennis J. Carney to the Steel Analysts Group on September 11, 1978.

—Report on the Annual Meeting of Shareholders and Results for the Three Months Ended March 31, 1979.

—Annual Report of Wheeling-Pittsburgh Steel Corporation for 1978.

3.—Letter from City National Bank of Detroit to John W. Testa dated April 16, 1979.

—Letter from Continental Bank to John W. Testa dated April 23, 1979.

—Letter from The First National Bank of Boston to John W. Testa dated April 23, 1979.

—Letter from the First Pennsylvania Bank of Philadelphia to John W. Testa dated May 9, 1979.

—Letter from Manufacturers Hanover Trust Company to A. Richard Rosavage dated April 23, 1979.

—Letter from Manufacturers National Bank to John W. Testa dated April 23, 1979.

—Letter from Pittsburgh National Bank to A. Richard Rosavage dated April 26, 1979.

—Letter from The Royal Bank of Canada to John W. Testa dated March 15, 1979.

—Letter from Manufacturers Hanover Trust Company to John W. Testa dated March 29, 1979.

4.—Letter from Lehman Brothers Kuhn Loeb to A. Richard Rosavage dated January 3, 1979.

5.—Press Release dated May 4, 1979.

—Article from Business Week dated March 26, 1979.

6.—There are no documents relative to Item 6 in your letter.

In our telephone conversation of June 29, 1979, you indicated to me that you wanted copies of any documents which evidenced the satisfaction of the terms and conditions of the letters of intent from the Economic Development Administration and the Farmers Home Administration. Many of the documents included herewith evidence satisfaction of the terms and conditions.

As I told you on the telephone, Item 2 in each of the letters is satisfied by a Consent Decree which has been signed by Wheeling-Pittsburgh Steel Corporation, the United States Environmental Protection Agency and the States of Ohio, West Virginia and Pennsylvania. The Consent Decree was signed by Wheeling-Pittsburgh and the U. S. Environmental Protection Agency on March 19, 1979. The States added their signatures at later dates. The Consent De-

cree has not yet been lodged with the United States District Court for the Western District and we have agreed with the U. S. Environmental Protection Agency not to release the Consent Decree until it has been lodged with the Court. Copies of the Consent Decree would, I am sure, be made available to you for your examination by the EPA upon request.

Again, as we discussed on the telephone, many of the items set forth in the letters of intent have been discussed extensively with personnel at the Economic Development Administration and at the Farmers Home Administration. While there are very few documents relating to these talks, I am sure that these talks can be substantiated by personnel from those agencies.

With respect to the commitment of the Pennsylvania Industrial Development Authority and the Middle Monongahela Industrial Development Association, Inc. (Item 4 of the letters of intent) a complete hearing was conducted by the Pennsylvania Industrial Development Authority in Harrisburg which resulted in the letter of April 5, 1979. A copy of the transcript of that hearing can be made available to you if you believe that it is pertinent to your review.

As I told you on the telephone, there are many work product documents relating to Items 3 and 4 of your letter of June 25, 1979. We will be pleased to have you examine those documents on our premises or we will bring those documents to Washington for your examination. We are not prepared to deliver the documents to you since they will thereby become a part of your files and we consider the documents to be of a highly confidential nature. I will be happy to discuss this point with you at your convenience.

I believe that the foregoing submission substantially fulfills the request which you forwarded to us on June 25, 1979. However, because of the urgency with which your request was presented and our desire to comply with it promptly, it is very possible that we have inadvertently not included "all documents or other materials" relating

to the matters covered in your June 25, 1979 letter. It may, therefore, be necessary to supplement this submission at a later date. In a spirit of cooperation, Wheeling-Pittsburgh will be pleased to discuss any and all of these items with you upon request.

Very truly yours,

George Raynovich, Jr.

GR:nr

Enclosures

bcc: C. C. Cohen, Esq.

APPENDIX F

SECURITIES AND EXCHANGE COMMISSION

ATTACHMENT TO SUBPOENA

TO: Dennis J. Carney and Wheeling-Pittsburgh Steel Corporation

DATED: August 2, 1979

CASE FILE NO. HO–1175

A. This subpoena covers all documents described below in the possession of the addressee of this subpoena, or subject to his custody or control.

B. Unless the context indicates otherwise, the following words and phrases are defined and used herein as follows:

(1) "Document" or "Documents" refer to all written or graphic matter, however produced or reproduced, or to any other tangible permanent record, and without limitation, shall include, among other things, all letters, correspondence, records, memoranda, minutes, notes, summaries, telephone records, bank checks, bank deposit slips, bank credit and debit memoranda, bank drafts, bank statements, books, schedules, reports, studies, appraisals, analyses, lists, surveys, budgets, financial statements, financial projections, financial calculations, contracts, agreements, periodicals, charts, graphs, interviews, speeches, transcripts, depositions, press releases, brochures, books of account, telegrams, notes and minutes of meetings of directors or other meetings, interoffice communications, results of investigations, working papers, computer data, maps, papers similar to any of the foregoing, and other writings of every kind and description (whether or not actually used, and including drafts of all documents), and including not only originals of such documents but all photostatic or microfilmed copies in whatever form, and all sound recordings in whatever form.

(2) A document or communication "relating or incident to" a given subject matter means any document or communication that constitutes, contains, embodies, comprises, reflects, identifies, states, refers to, deals with, comments on, responds to, describes, analyzes, or is in any way pertinent to that subject, including, without limitation, documents concerning the presentation of other documents.

*Documents to Be Produced*

All documents relating or incident to any and all of the following:

Unless otherwise indicated, for the period from January 1, 1979 to the present and excluding any documents otherwise responsive to the specifications hereof which have already been produced to the Commission's staff:

SUBPOENA DUCES TECUM

# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

*To* DENNIS J. CARNEY and WHEELING-PITTSBURGH

STEEL CORPORATION, P.O. Box 118, Pittsburgh, Pa. 15230

*At the instance of* the United States Securities and Exchange Commission *you are hereby required to appear before* Martin H. Aussenberg and Frederick W. London, Officers

574

*of the Securities and Exchange Commission, at* Room 633, United States Post Office and Courthouse,

*in the City of* Pittsburgh, Pennsylvania

*on the* 3rd *day of* August *, 1979, at* 9:30 *o'clock* a.m. *of that day, to testify in the Matter of* Wheeling-Pittsburgh Steel Corporation *involving* a formal order of private investigation pursuant to Section 21(a) of the Securities Exchange Act of 1934

*And you are hereby required to bring with you and produce at said time and place the following books, papers, and documents:*

SEE ATTACHMENT

*Fail not at your peril.*

*In testimony whereof, the seal of the Securities and Exchange Commission is affixed hereto, and the undersigned, a member of said Securities and Exchange Commission, or an officer designated by it, has hereunto set his hand at* Washington, D.C. *this* 2nd *day of* August *, 1979.*

Martin H. Aussenberg, an officer

NOTICE TO WITNESS.—If claim is made for witness fee or mileage, this subpoena should accompany voucher. Witness fee and mileage shall be paid by the party at whose instance the witness appears.

[SEAL] SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, D.C. 20549

August 2, 1979

VIA TELECOPIER

Dennis J. Carney and
Wheeling-Pittsburgh Steel Corporation
P.O. Box 118
Pittsburgh, Pa.

RE: Wheeling-Pittsburgh Steel Corp. HO-1175

Dear Sirs:

Pursuant to a formal order of investigation of the Commission in the above-referenced matter, enclosed please find a subpoena duces tecum which requires you to produce certain documents and records and to appear for testimony at the time and place indicated by the subpoena.

If any documents called for are not furnished, please list such documents and indicate their location and the reason for their non-production.

If any documents called for are withheld because of a claim of attorney-client privilege, the list of withheld documents should identify: (a) the attorney and client involved; (b) all persons or entities shown on the document to have received or sent the

document; (c) all persons or entities known by you to have been furnished the document or informed of its substance.

This inquiry is confidential and should not be construed as an indication by the Commission or its staff that any violations of law have occurred, or as a reflection upon the merits of the securities involved or upon any person who effected transactions in such securities.

I am also enclosing a notice given pursuant to the Privacy Act of 1974.

If you have any questions concerning your rights and duties, you may wish to consult counsel. If you have any questions concerning the subpoena or the documents required to be produced thereto, please call the undersigned at (202) 755–1764.

Very truly yours,

/s/ Martin H. Aussenberg
Martin H. Aussenberg
Special Counsel

Enclosures

1. The basis for the following statements in the April 27, 1979 Report on the Annual Meeting of Stockholders and Report on Results for the Three Months Ended March 31, 1979 of Wheeling-Pittsburgh Steel Corporation (hereinafter "W–P") that:

 a. "We obtained commitments for federal loan guarantees of $140 million and for a $10 million direct loan through the state of Pennsylvania."

 b. ". . . We were unable to finance these needed expenditures through private sources . . ."

2. Press releases, announcements and other statements, written or oral, made by W–P or any of its officers, directors, employees or agents, to W–P stockholders, the news media, securities analysts or others, concerning the federal loan guarantees, state loans, financing by insurance companies and/or the $77 million line of credit, referred to in the April 27, 1979 W–P report.

3. The $77 million revolving credit line referred in the April 27, 1979 W–P report.

4. The "financial arrangements . . through a consortium of insurance companies" referred to in the April 27, 1979 W–P report of W–P.

5. Statements, written or oral, made by W–P or any of its officers, directors, employees or agents, during the period January 1, 1979 to the present, to W–P stockholders, the news media, securities analysts or others concerning inquiries, approaches, offers, proposals or expressions of possible interest by companies or individuals concerning acquiring a 5% or greater interest in W–P's stock or assets.

6. Inquiries, approaches, offers, proposals or expressions of possible interest by other companies or individuals concerning acquiring a 5% or greater interest in W–P's stock or assets (from June, 1978 to the present).

7. Inquiries, approaches, offers, proposals or expressions of possible interest by W–P or any of its officers, directors, employees or agents, concerning W–P's acquiring a 5% or greater interest of any other company or business entity (from June, 1978 to the present)

8. The satisfaction, non-satisfaction or status of W–P's compliance with the "conditions" contained in the "letters of intent" regarding the proposed loan guarantees from the Economic Development Administration of the Department of Commerce and from the Farmers Home Administration of the Department of Agriculture.

9. Purchases or sales of W–P's common stock, including but not limited to, such purchases or sales by officers, directors, employees or agents of W–P) (excluding stock transfer records)