648 F.2d 118
 Fed. Sec. L. Rep. P 97,833
SECURITIES AND EXCHANGE COMMISSION, Appellant,
v.
WHEELING-PITTSBURGH STEEL CORPORATION, a corporation, and
Dennis J. Carney, Chairman, President and Chief
Executive Officer.
 No. 80-1375.
 United States Court of Appeals,
Third Circuit.
 Argued July 8, 1980.
Reargued En Banc Nov. 17, 1980.
Decided Jan. 21, 1981.
Rehearing Denied Feb. 19, 1981.
 
 Ralph C. Ferrara, Gen. Counsel (argued), Michael K. Wolensky, Associate Gen. Counsel, David A. Knight, Atty., Washington, D.C., for appellant; Paul Gonson, Sol., S.E.C., Washington, D. C., of counsel.
 Paul A. Manion (argued), Charles C. Cohen, Fredrick N. Egler, Jr., Reed, Smith, Shaw & McClay, Pittsburgh, for appellees.
 Argued July 8, 1980
 Before SEITZ, Chief Judge, ADAMS, Circuit Judge, and LORD, District Judge.*
 Reargued Nov. 17, 1980
 Before SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS, GARTH, HIGGINBOTHAM and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 This appeal requires us to decide if the district court erred in refusing to enforce a subpoena duces tecum issued by the Securities and Exchange Commission pursuant to § 21(b) of the Securities Exchange Act, 15 U.S.C. § 78u(b), to Wheeling-Pittsburgh Steel Corporation (W-P) and its president, Dennis J. Carney. The district court determined that W-P failed to meet its burden of proving that the SEC acted in bad faith, 482 F.Supp. 555, 563-564 but concluded that the SEC "has permitted, and at times encouraged, the abuse of its investigating function," id. at 565. Accordingly, the court denied enforcement of the subpoena, and the SEC has appealed. Because we believe that the district court must educe additional testimony and clarify its determinations, we will vacate the order, and remand these proceedings for further consideration.
 
 
 2
 The subpoena was issued to compel Mr. Carney to identify companies involved in reported merger negotiations with Wheeling-Pittsburgh and to provide documents relating to those negotiations. Wheeling-Pittsburgh's basic contention is that the SEC proceedings are tainted because of improper interference by United States Senator Lowell Weicker of Connecticut on behalf of the Colorado Fuel and Iron Company (CF&I), an acknowledged competitor of Wheeling-Pittsburgh, for no legitimate legislative purpose. The district court was persuaded that sufficient improprieties had occurred to deny enforcement of the subpoenas.
 
 
 3
 Because the district court determined that W-P had not proved bad faith on the part of the SEC, the precise issue before us is whether the court's determination that the SEC allowed its investigatory process to be abused is sufficient under the teachings of United States v. Powell, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964), to deny enforcement of the SEC's subpoena. Corollary issues of equal importance are whether we should determine the length of time the refusal to enforce should remain in effect and, if so, an identification of conditions affecting that time period.
 
 I.
 
 4
 Wheeling-Pittsburgh Steel Corporation, a Delaware corporation with offices at Pittsburgh, Pennsylvania, manufactures and sells steel and related products. Its stock is registered pursuant to § 12(b) of the Securities Exchange Act, 15 U.S.C. § 78l (b), and is listed on the New York Stock Exchange. W-P files annual and other periodic reports with the SEC pursuant to § 13(a) of the Act, 15 U.S.C. § 78m(a); see 17 C.F.R. § 240.13a-1. Mr. Carney is President and Chief Executive Officer of Wheeling-Pittsburgh.
 
 A.
 
 5
 Beginning in 1977, and for some time thereafter, W-P attempted to obtain loan guarantees from the Economic Development Administration of the United States Department of Commerce (EDA) and the Farmers Home Administration of the United States Department of Agriculture (FmHA). The loans, to be obtained from private lenders, were to be used to install government mandated pollution control equipment at several plants and to construct a rail rolling mill at Monessen, Pennsylvania. The court found that the loan guarantees were critical to the company because the rail rolling mill could not be constructed without pollution control devices required by the Environmental Protection Agency. In addition, the company could not finance the production facility construction without the loan guarantees.
 
 
 6
 United States Steel Corporation, Bethlehem Steel Corporation, and CF&I also manufacture steel rails and all have opposed loan guarantees to W-P. The district court found that CF&I, a company owned by Crane Company, played a major role in opposing the guarantees, individually and in conjunction with Senator Weicker.
 
 
 7
 W-P signed loan guarantee agreements with the EDA on August 28, 1979, under which the EDA pledged to guarantee loans totaling $100 million. Of this $100 million, $63.5 million are earmarked to finance partial construction of the mill at Monessen, Pennsylvania, and $36.5 million are to finance the purchase and installation of pollution control equipment at plants in Monessen and Allenport, Pennsylvania. On the same day, FmHA issued conditional commitments (revised and reissued in September, 1979, and further revised in September, 1980) to guarantee six separate loans to W-P totaling $50 million for the purchase and installation of pollution control equipment at plants in Ohio and West Virginia. These guarantees have induced a consortium of private lenders to agree to extend loans to W-P for the purposes contemplated by the guarantees. As of the date of oral argument, W-P had actually received over $50 million in guaranteed loan funds.[1] The balance of almost $100 million represents loans that W-P expects to draw at intervals through the end of 1982. W-P's application for these loan guarantees and the violent opposition thereto by Senator Weicker and CF&I precipitated this law suit.
 
 B.
 
 8
 On December 28, 1978, and January 9, 1979, before the loan guarantee agreements were actually executed, Carney received identical "Letters of Intent" from EDA and FmHA. The letters stated that the agencies "will recommend" respectively to the Assistant Secretary for Economic Development and the Assistant Secretary for Rural Development loan guarantees of $100 million (EDA) and $40 million (FmHA). The "Letters of Intent" were contingent on a number of provisions. The district court determined that "(a) careful examination of these provisions reveals, however, that the conditions involved ministerial matters which offered no major obstacles to receipt of the guarantees." 482 F.Supp., at 558.
 
 
 9
 On April 27, 1979, in a "Report on the Annual Meeting of Stockholders," Carney discussed the status of the loan guarantees: "We obtained commitments for federal loan guarantees of $140-million, and for a $10-million direct loan through the State of Pennsylvania. These commitments will enable us to finalize financial arrangements in June through a consortium of insurance companies." Report on the Annual Meeting of Stockholders and Report on Results for the Three Months Ended March 31, 1979 (April 27, 1979), at 10. In the same report, Carney remarked: "We are also exploring future acquisitions being proposed to us by several domestic and foreign firms." Id. at 12. Following the report to shareholders, Carney spoke to news reporters. He related that the turnaround in W-P's financial position had attracted domestic and foreign concerns who were interested in entering business combinations, but "so far none of them looks good." He termed the discussions "preliminary" and declined to elaborate. Wall St.J., April 30, 1979, at 20, col. 6.
 
 
 10
 In September, 1978, before W-P had received the first "Letter of Intent," CF&I's counsel, Paul R. Hundt, hired Arthur T. Downey, an attorney in Washington, D. C., to assist CF&I in opposing W-P's efforts to obtain the guarantees. That opposition led Downey to meet in February, 1979, with two members of Senator Lowell Weicker's staff. App. at 419-20. Senator Weicker was the ranking minority member of the Subcommittee for State, Justice & Commerce Appropriations of the Senate Committee on Appropriations. That subcommittee was in charge of a supplemental appropriation to the EDA essential to the W-P loan guarantees. The record indicates that between February and October, 1979, Downey met with Timothy Keeney, Weicker's administrative assistant, as many as ten to twenty times. App. at 425.
 
 
 11
 Downey continued his assault on the W-P loan application by writing to the EDA and the FmHA, suggesting that these agencies compel W-P to withdraw the statements made in the quarterly report concerning "commitments" received from those agencies. He then furnished Keeney with copies of the quarterly report and of his letters to EDA and FmHA. Later, Keeney and Downey met in Downey's office to discuss the W-P quarterly report in preparation for a hearing before Weicker's subcommittee on June 4, 1979.
 
 
 12
 Weicker publicly attacked the proposed EDA loan guarantee to W-P at the June 4 hearing and thereafter. App. at 215-16. Carney appeared at the June 11, 1979, subcommittee hearing to explain W-P's position. On the evening before the hearing, Downey and various CF&I executives met with Keeney in a hotel in Washington, D.C. App. at 576-79. Carney appeared on June 11, read a prepared statement, and was questioned by various members of the subcommittee. Weicker and Carney engaged in a colloquy over the distinction between a "letter of intent" and a "commitment." Although Carney contended that the terms were substantially synonymous, Weicker expressed the view that use of the term "commitments" in Carney's report to W-P shareholders violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Commission Rule 10b-5, 17 C.F.R. § 240.10b-5 (1980).
 
 
 13
 Subsequently, the subcommittee approved the appropriation for the W-P loan guarantee over the opposition of Senator Weicker, who declared that he would take the matter to the floor of the Senate. He later did so, but at the same time opened a new front in his opposition to the W-P loans, soliciting the cooperation of the SEC in his campaign against W-P. Three days after the Senate subcommittee hearing, Weicker had a letter delivered by hand to Stanley Sporkin, head of SEC's Division of Enforcement, requesting an investigation of whether Carney's use of the term "commitments" instead of "letters of intent" in his report to W-P stockholders constituted a violation of the Securities Exchange Act of 1934. App. at 37-38.
 
 
 14
 Sporkin routed the letter to Richard E. Brodsky of the Division of Enforcement, who then assigned the case to staff attorney Martin Aussenberg. Aussenberg contacted Keeney on June 19. Keeney explained the loan guarantee process to Aussenberg, advised him of W-P's pending application, noted Carney's use of the word "commitments" in the quarterly report, and gave Aussenberg a transcript of the Senate hearings. Keeney also suggested that Aussenberg contact Downey, whom he described as CF&I's attorney. When Aussenberg called Downey later that same day, Downey suggested other potential securities law violations. Downey testified that CF&I was "frustrated" and "exasperated" by its inability to block the loan guarantees and that he provided much of the information as a means of "venting my exasperation." Deposition of Arthur T. Downey (Oct. 9, 1979) at 193, 195, reprinted in App. at 592, 594; see 482 F.Supp., at 559.
 
 
 15
 While conducting the informal inquiry, Aussenberg received a call from Keeney, who asked what actions the SEC had taken in response to Senator Weicker's letter. Aussenberg refused to disclose any information or even confirm the existence of SEC investigations. In a second call, Keeney notified Aussenberg that Senator Weicker intended to introduce an amendment to the supplemental appropriations bill for the EDA and that the amendment would preclude the EDA from providing federal loan guarantees to corporations under investigation by the SEC. The SEC objected to Weicker's amendment through Aussenberg, and expressed fear that the amendment would compromise the confidentiality of its investigation. On June 25, Senator Weicker introduced the amendment,[2] along with nine others, each of which would have blocked an EDA loan guarantee to W-P. During the Senate debate on Weicker's amendment, he engaged in a heated exchange with Senator John Heinz of Pennsylvania, during which Senator Heinz questioned the motives of Senator Weicker.[3] When the amendment that would have tied loan guarantees to SEC activity was called for a vote, it was defeated by a substantial margin.
 
 
 16
 The SEC entered an order pursuant to 17 C.F.R. § 202.5(a) on July 31, 1979, directing a private formal investigation into W-P's activities and Carney's statements. The order empowered the Commission officers to issue subpoenas, take testimony, and compel the production of documents. The SEC issued a subpoena duces tecum to Carney on August 2, 1979, who appeared for questioning by Aussenberg. Aussenberg's inquiries focused primarily on the loan guarantee process, particularly Carney's use of the word "commitments" in the report of April 27. Carney answered all questions relating to the loan guarantees. During a final phase of the deposition, however, Aussenberg instructed Carney to disclose the names of every company that had approached him, or he had approached, since January, 1979, concerning possible acquisition by or of W-P. Carney refused to divulge names or turn over any documents pertaining to those discussions.
 
 
 17
 On August 15, 1979, W-P filed a motion for a protective order to enjoin further attempts to obtain information from Carney. On August 17, the SEC filed the present subpoena enforcement action. W-P then voluntarily dismissed its motion for a protective order but in its answer requested an injunction against the investigation. It later withdrew that request. The case was heard before the district court on August 22. The court conducted four additional hearings primarily focusing on two allegations by W-P: that the SEC allowed Senator Weicker and CF&I to abuse its normal discretionary investigative process, and that the SEC acted in bad faith in investigating W-P. The district court treated these allegations separately. It primarily emphasized the abuse of the investigative process and concentrated on the motivation of third parties who may have influenced the SEC investigation.
 
 
 18
 Although recognizing that the merit of the SEC's charges was not before it, the court expressed skepticism about the reasonableness of the charges, characterizing them as "patently frivolous." 482 F.Supp., at 566. It determined that the SEC's investigative process had been abused by third parties, and that "(w)ittingly or not, the agency has permitted, and at times encouraged, the abuse of its investigating function." Id. at 565. The court held that it would not "compound the gross lack of judgment by sanctioning such abuse." Id. Yet it concluded that W-P did not meet its burden of proving that the SEC was acting in "bad faith." Id. at 563-564 (footnote omitted).
 
 
 19
 The special dichotomy employed by the district court is central to the resolution of this appeal. If the abuse of process contention is considered to be subsumed in the good faith argument, then we believe there is an inconsistency in the district court's determination. Resolution of this inconsistency requires a remand for the purpose of clarification. If the contentions are separate and distinct, the proceedings still must be remanded for development of an adequate record on the abuse of process issue. The district court seems to have concentrated on the abuse by third parties of the agency's process, and did not explain, to our satisfaction, the relationship between the abuse of the agency's process and the abuse of the court's process. This can be rectified by further discovery and testimony. We note that following the October 27, 1979, hearing W-P advised the district court that it would not press its right for discovery if the court denied the SEC's application for enforcement. The following considerations will guide the district court's proceedings on remand.
 
 II.
 
 20
 In asking this court to reverse the district court's refusal to enforce the subpoenas, the Commission argues that the district court exceeded the narrow authority accorded it in administrative subpoena enforcement actions. The implicit premise of the Commission's argument is that the judiciary's role is strictly confined by Supreme Court precedent and that, under these authorities, a court has little flexibility in confronting new situations.[4] Although we agree that courts generally must defer to the agencies and that the scope of judicial inquiry is not expansive, we disagree with the Commission's premise that the Supreme Court has foreclosed incremental development of the law by the courts when we are faced with allegations of egregious abuses.
 
 A.
 
 21
 We begin by noting that although congressional subpoenas are self-executing, McGrain v. Daugherty, 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580 (1927), Congress has entrusted the enforcement of the administrative process for the production of witnesses and papers to the courts. United States v. Friedman, 532 F.2d 928, 936-37 (3d Cir. 1976).[5] Since ICC v. Brimson, 154 U.S. 447, 14 S.Ct. 1125, 38 L.Ed. 1047 (1894),[6] it has been clear that in passing on the application for enforcement of a subpoena the court acts judicially in a case or controversy. See In re Grand Jury Proceedings, 486 F.2d 85, 90 (3d Cir. 1973) (Schofield I ). Appellate courts have consistently recognized that whether to enforce an administrative subpoena is a judicial decision, based on the totality of particular circumstances proved on a given record. This court, speaking through Judge Gibbons, has emphasized that "federal courts have never lent their enforcement machinery to an executive branch investigative body in the manner of a rubber stamp." Id.
 
 
 22
 In several decisions in the last two decades,[7] culminating most recently in United States v. LaSalle National Bank, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978), the Supreme Court has enunciated standards for district court enforcement of an Internal Revenue Service summons when the recipient of the summons alleges that the Service is using its civil investigative authority to gather evidence for a criminal prosecution. The Court in these decisions has recognized the importance of judicial deference to administrative agencies in conducting investigations, and has admonished all federal courts that frequent judicial interference is inappropriate. See LaSalle National Bank, 437 U.S. at 316-17, 98 S.Ct. at 2367-2368. Up to the present time, the decisions of the Court have addressed only the use of civil summons authority in furtherance of a criminal investigation, and the Court therefore has had the opportunity to recognize only that abuse as a basis for invalidating an IRS summons.
 
 
 23
 But because the Supreme Court has never confronted allegations like the ones before us does not mean that the federal judiciary is powerless to structure relief when necessary. In United States v. Friedman, 532 F.2d at 937, we noted in the context of still another IRS civil summons proceeding that the IRS civil summons statute, I.R.C. § 7604,
 
 
 24
 follows the classic model, without in any way purporting to limit the power of the judiciary to choose an appropriate rule of decision in an enforcement proceeding. In other subpoena enforcement proceedings the courts have looked to non-statutory sources for appropriate guidance
 
 
 25
 We conclude that from the very fact that enforcement of a § 7602 summons is by § 7604(b) entrusted to the judiciary, this court has the power to fashion appropriate rules as to the fairness of the enforcement order.
 
 
 26
 (footnote omitted); cf. Schofield I, 486 F.2d at 92 (supervisory role of judiciary over grand jury subpoenas). As the Supreme Court noted in Powell, 379 U.S. at 58, 85 S.Ct. at 255, "(i)t is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused." (footnote omitted).
 
 
 27
 Our analysis is further supported by the persistent theme running through the Court's decisions in this area that an administrative summons can be challenged "on any appropriate ground." Reisman v. Caplin, 375 U.S. 440, 449, 84 S.Ct. 508, 513-514, 11 L.Ed.2d 459 (1964). The Court has subsequently quoted this language in United States v. Powell, 379 U.S. at 58, 85 S.Ct. at 255, Donaldson v. United States, 400 U.S. 517, 526, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971), and LaSalle National Bank, 437 U.S. at 306, 98 S.Ct. at 2362. In LaSalle, the Court went even further to emphasize that "(t)he Powell elements were not intended as an exclusive statement about the meaning of good faith." 437 U.S. at 317 n.19, 98 S.Ct. at 2368 n.19. At another point, the Court reiterated that "(t)hese requirements are not intended to be exclusive. Future cases may well reveal the need to prevent other forms of agency abuse of congressional authority and judicial process." Id. at 318 n.20, 98 S.Ct. at 2368, n.20.[8] We deem this calculated reiteration of the equitable powers of federal courts to deny enforcement in appropriate cases to be very significant.
 
 
 28
 Because the courts must not interfere unduly in the administrative process, see note 12 infra, our primary concern is with the integrity of the judicial process; our examination of the administrative process at this stage is important only to the extent that it bears on the agency's request that the court's process be used to enforce its subpoena. We have some doubt whether the parties correctly perceived the distinction between abuse by an agency of the court's process and abuse by third parties of the administrative process. The court's determination that W-P had failed to demonstrate the SEC's bad faith, though a rejection of the most common basis for attacking an agency subpoena, does not foreclose further inquiry. But if the court directed the further inquiry to the motivations of third parties and their illicit use of the agency's authority to investigate, that inquiry was misdirected. In our view, the inquiries in an adversary enforcement proceeding are limited: a determination that the court's process would or would not be abused by enforcement of the subpoena, and the conclusion that enforcement will be denied or granted. In the case before us, the presence of SEC bad faith is only one of several possible reasons for the ultimate conclusion; a determination that the court's process would be abused if the subpoena were to be enforced is the ultimate conclusion. Similarly, the finding that the SEC knew that its process was being abused, that it knowingly did nothing to prevent this abuse, see 482 F.Supp., at 560, 565, and, in addition, that it vigorously pursued the frivolous charges is, like a determination of bad faith, a separate reason for an ultimate conclusion that the court's process was being abused.[9] The distinction between the abuse of the SEC's process and abuse of the court's process must always be recognized.
 
 
 29
 Good jurisprudence advises against statement of universal precepts in single cases, see Walz v. Tax Commission, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970), especially when the allegations are as unusual as the ones in this case. But because the allegations in this case are so unusual, they would, if proved, transcend the reason for judicial deference to the SEC. And, given our disposition of this case, we perceive no threat to the efficient functioning of the SEC's investigative process by giving Wheeling-Pittsburgh an opportunity to conduct discovery prior to its attempt to prove its non-frivolous allegations. We conclude, therefore, that neither the reasons nor the language of the Supreme Court administrative summons decisions forecloses us from allowing an inquiry into W-P's allegations of abuse.
 
 B.
 
 30
 Our ultimate inquiry, therefore, is whether enforcement of the administrative subpoena would constitute an abuse of the court's process. One determination that would support such a conclusion that the agency is abusing the court's process is a finding that the agency is acting in "bad faith." In analogous situations, the Supreme Court has defined "bad faith" as a "prosecution brought without a reasonable expectation of obtaining a valid conviction." Kugler v. Helfant, 421 U.S. 117, 126 n.6, 95 S.Ct. 1524, 1531-1532, n.6, 44 L.Ed.2d 15 (1975); see also Perez v. Ledesma, 401 U.S. 82, 85, 91 S.Ct. 674, 677, 27 L.Ed.2d 701 (1971) ("without hope of obtaining a valid conviction"); Cameron v. Johnson, 390 U.S. 611, 619-20, 88 S.Ct. 1335, 1339-1340, 20 L.Ed.2d 182 (1968). In this case, W-P has alleged that a politically powerful third party influenced the SEC to bring an action that it ordinarily would not pursue. To determine if W-P has met its burden of alleging abuse of the court's process, we must first examine the relationship of this allegation to the bad faith standard. The examination must not end there, however, because "bad faith" action by the agency represents but one ground for denying the enforcement request.
 
 
 31
 We do not doubt the usefulness to administrative agencies of information gained from third parties. Nor do we doubt that frequently the motivations of informants are less than altruistic. See United States v. Cortese, 614 F.2d 914, 921 (3d Cir. 1980). But we cannot simply avert our eyes from the realities of the political world: members of Congress are requested to, and do in fact, intrude, in varying degrees, in administrative proceedings. One commentator has said recently of the Internal Revenue Service:
 
 
 32
 (A)lthough the IRS ultimately must be accountable to Congress, whose members are in turn accountable to the people, the IRS also has a constitutional duty to execute the tax law faithfully by determining and administering it properly. The IRS must give congressional comments only as much deference as they deserve on the merits, for the agency has no duty to placate particular congressmen or committees. Given the fine line between lawmaking and law enforcement, it is always difficult to say when one shades into the other, but clearly there is an inevitable tension between congressional oversight powers and the executive exercise of delegated powers to interpret, articulate, and execute the tax laws.
 
 
 33
 Parnell, Congressional Interference in Agency Enforcement: The IRS Experience, 89 Yale L.J. 1360, 1368 (1980) (footnotes omitted).[10] The duty of the SEC, therefore, is not to ignore information given to it by congressmen,[11] but to "give congressional comments only as much deference as they deserve on the merits." Id. An administrative agency that undertakes an extensive investigation at the insistence of a powerful United States Senator "with no reasonable expectation" of proving a violation and then seeks federal court enforcement of its subpoena could be found to be using the judiciary for illicit purposes. We need not lend the processes of the federal courts to aid such behavior.
 
 
 34
 The allegations by Wheeling-Pittsburgh and the preliminary submissions before the district court are substantial enough not to be dismissed as a matter of law. Under the SEC's own regulations, it may conduct two types of investigations. A preliminary investigation, in which no process is issued or testimony compelled, is proper whenever "it appears that there may be (a) violation " 17 C.F.R. § 202.5(a) (1980). A formal investigation, in which process may be used, may be ordered by the Commission if "it appears from information obtained that there is a likelihood that a violation has been or is about to be committed and that the issuance of process may be necessary " Id. In this case, the Commission issued a formal investigation order on July 26, 1979, and therefore must have found a "likelihood" of a violation. See In re Wheeling-Pittsburgh Steel Corp., File no. HO-1175 (SEC July 31, 1979). This implicit finding by the Commission cannot be squared with the district court's conclusion that the claims of wrongdoing by W-P are "patently frivolous." 482 F.Supp., at 566.
 
 
 35
 Although we will not countenance judicial interference with agency decisions to conduct investigations, decisions that are committed entirely to agency discretion,[12] if the district court reaffirms its determination of frivolity after a more thorough review of the evidence, this judicial conclusion would serve as an impressive indication of agency bad faith or harassment, or adoption by the SEC of the animus of a third party who inspired the agency's action originally. See Cortese, 614 F.2d at 921. Alternatively, the district court's determination that the SEC knowingly allowed its process to be abused would also be consistent with a finding that the Commission allowed a formal investigation to proceed without first ascertaining the "likelihood" of a violation. See district court op., at 565-566.[13] At all times, of course, the burden is on the respondent of showing an abuse of the court's process, Powell, 379 U.S. at 58, 85 S.Ct. at 255, and, at least in the context of the Internal Revenue Service's criminal and civil fraud liability, the Court has indicated that the burden of proving bad faith "is a heavy one." LaSalle National Bank, 437 U.S. at 316, 98 S.Ct. at 2367. Nevertheless, these considerations bear on the ultimate question of whether the SEC is pursuing a claim it knows it cannot win, or is in some other manner abusing the court's process.
 
 
 36
 We are unable to determine from the district court's memorandum whether it properly focused on the motivation of the Commission rather than on the motivations of third parties. Although the court rejected W-P's argument that the SEC had acted in bad faith, 482 F.Supp., at 563-564 and that the SEC had adopted the illicit motivations of the third parties, id. at 565 it did find that the SEC had "permitted, and at times encouraged, the abuse of its investigative process," id. The court further determined that the charges of securities law violations were "patently frivolous." Id. at 566. This court has previously made clear that the proper focus in a challenge to an administrative subpoena is motivation of the agency itself, not that of third parties. See Cortese, 614 F.2d at 921. Today we make clear that the ultimate determination is whether judicial enforcement, as requested by the agency, will result in an abuse of the judicial process. From the record before us we are unable to ascertain whether the district court's determinations accord with these precepts. In addition, we have difficulty reconciling the court's refusal to find that the Commission was improperly motivated with its determination that the Commission permitted third parties to abuse its process by its decision to pursue frivolous charges. In these circumstances, we conclude that the proceedings should be remanded for clarification of these issues.
 
 C.
 
 37
 The basic structure for addressing these allegations is already in use in the district courts of this circuit. Under United States v. McCarthy, 514 F.2d 368, 372-73 (3d Cir. 1975), the district court must undertake a three step procedure before granting or denying enforcement of the subpoena. The agency seeking enforcement must first file a complaint alleging compliance with the Powell standards and an affidavit of the agent who issued the subpoena verifying those allegations. The person subpoenaed is then served, and finally a hearing is held during which the government must prove its compliance with the Powell standards. If the government makes this preliminary showing, the burden then shifts to the respondent to prove that enforcement of the subpoena would be improper under the test enunciated in Powell, 379 U.S. at 58, 85 S.Ct. at 255. In Powell the Supreme Court explained that "an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." Id. After these proceedings, the district court must make findings of fact and conclusions of law in conformity with Fed.R.Civ.P. 52(a), but if the record as then constituted is inadequate to dispose of the action, the trial judge may, in his discretion and on request, direct further proceedings including discovery. The trial judge must evaluate the assertions of the recipient of the subpoena and any evidence introduced by both parties before allowing substantial discovery. See United States v. Church of Scientology, 520 F.2d 818, 824-25 (9th Cir. 1975) (citing McCarthy ); United States v. Salter, 432 F.2d 697, 700 (1st Cir. 1970). This procedure requires the respondent to bear the initial burden of convincing the trial judge that the claimed abuse of process is not frivolous.
 
 
 38
 In this case, the procedure outlined in McCarthy was followed. When faced with the allegations of senatorial interference with the SEC, the trial judge concluded that W-P had met its burden of challenging the subpoena. Although we conclude that the record is not yet sufficient to reach this ultimate determination, we agree with the district court that non-frivolous allegations of senatorial interference do constitute sufficient grounds for further proceedings, including discovery. Three other courts of appeals have allowed closely supervised discovery when confronted with substantial allegations that agencies were abusing the judicial process. United States v. Fensterwald, 553 F.2d 231, 232-33 (D.C.Cir.1977) (per curiam); United States v. Church of Scientology, 520 F.2d at 822, 824-25; United States v. Salter, 432 F.2d at 700. Although respondent still confronts the burden of proving abuse, it has submitted sufficient "meaningful evidence," SEC v. Howatt, 525 F.2d at 229, that we cannot at this point foreclose further inquiry.
 
 
 39
 The district court's opinion did not delineate with specificity the distinction between a reason for the conclusion and the conclusion itself. We believe that a remand is necessary to clarify the basis for its refusal to enforce the subpoena in this unusual case. If the district court adheres to its conclusion that the court's processes were being abused, but, at the same time, that no case of SEC bad faith was proved, the district court should explain more clearly the other reason or reasons for its determination.
 
 
 40
 Moreover, upon remand, the district court will have the advantage of our teaching in United States v. Cortese, a decision handed down subsequent to the district court's opinion here. We do not believe that Cortese necessarily precludes a determination that the court's process was abused here. Although, as in LaSalle, the sole issue in Cortese was whether an investigation by a government agency was being conducted in good faith, we there emphasized that the animus of the third party was not determinative of the agency's good faith. But we acknowledged that "(a) different result may obtain if it were found that either the (agency) or the investigating agent was motivated by the same animus that motivated the (third party)." 614 F.2d at 921. In any event, Cortese did not intend to set forth the only defenses available to a respondent in an administrative subpoena case. To suggest that it did is to conclude, improperly, that this court has the power to limit the specific Supreme Court directions that a respondent to a subpoena may "challenge the summons on any appropriate ground." Reisman, 375 U.S. at 449, 84 S.Ct. at 513-514; see Powell, 378 U.S. at 58, 85 S.Ct. at 255.
 
 
 41
 On remand, the respondents should be entitled to discovery procedures. The respondents withdrew their discovery requests upon being advised that a determination of abuse was to be forthcoming from the court. The district court will be able to exercise its discretion in supervising this discovery to effect the best balance of allowing W-P access to relevant evidence but protecting the SEC from unnecessary burdens. See Fed.R.Civ.P. 26(c).
 
 III.
 
 42
 Should the district court reaffirm its decision to deny enforcement of the subpoena, the appellees cannot expect to be immunized from SEC investigations in perpetuo. We need not decide the effect of such a decision on the SEC's ability to pursue these allegations at some future time. We note, however, that the theory on which the district court disposes of the issue would bear heavily on the SEC's ability to pursue its investigation with the aid of the federal courts. If, for example, the district court determines that the SEC is pursuing the investigation in bad faith, for the sole purpose of blocking the loan guarantees, the taint of the investigation would seem to be substantially eliminated as to the guarantees when they are consummated. Any other residual effects of the taint will, of course, require independent evaluation. If the court determines that the SEC is pursuing allegations at the behest of a powerful third party without independently evaluating those allegations, a fresh evaluation by the Commission would not be out of order, and if it finds a likelihood of a violation, it can reinstitute the judicial action to enforce the subpoena. Finally, if the court determines that the Commission is knowingly pursuing frivolous allegations in bad faith, it might be foreclosed from using the court's process to serve those ends against W-P in this case. In any event, there no doubt will be reopening of discovery and review by the district court of additional evidence.
 
 IV.
 
 43
 We acknowledge that, arguably, it may be possible for us at this time to affirm the district court judgment on the theory that the court was not restricted to deciding the case on the basis of the institutional good faith of SEC investigators, and that sufficient narrative or historical facts were found, not clearly erroneous, supporting the theory that "the totality of circumstances here presented creates the appearance of a partnership between the Commission and persons (knowingly abusing the SEC procedures)." District court op., at 565. Supporting this theory is the district court's finding that "(t)he Downey deposition, when considered with additional evidence of record, discloses that the Commission was aware that it was being used, and did nothing to prevent the abuse of its process." Id. at 560. Because of the apparent inconsistencies in the district court's opinion, however, we prefer not to meet this issue at this time. We believe that the better course is for the district court to reconsider the cause with a more specific concentration on how, if at all, the SEC order of a private investigation was not in accordance with 17 C.F.R. § 202.5(a), or was unduly tainted by third-party interference.
 
 
 44
 At bottom, this case raises the question whether, based on objective factors, the SEC's decision to investigate reflected its independent determination, or whether that decision was the product of external influences. The reality of prosecutorial experience, that most investigations originate on the basis of tips, suggestions, or importunings of third parties, including commercial competitors, need hardly be noted. That the SEC commenced these proceedings as a result of the importunings of Senator Weicker or CF&I, even with malice on their part, is not a sufficient basis to deny enforcement of the subpoena. See Cortese, 614 F.2d at 921. But beginning an informal investigation by collecting facts at the request of a third party, even one harboring ulterior motives, is much different from entering an order directing a private formal investigation pursuant to 17 C.F.R. § 202.5 (1980), without an objective determination by the Commission and only because of political pressure. The respondents are not free from an informal investigation instigated by anyone, in or out of government. But they are entitled to a decision by the SEC itself, free from third-party political pressure, that a "likelihood" of a violation exists and that a private investigation should be ordered. See 17 C.F.R. § 205.2(a). The SEC order must be supported by an independent agency determination, not one dictated or pressured by external forces. If an allegation of improper influence and abdication of the agency's objective responsibilities is made, and supported by sufficient evidence to make it facially credible, respondents are entitled to examine the circumstances surrounding the SEC's private investigation order. The court should be guided by twin beacons: the court's process is the focus of the judicial inquiry and the respondent may challenge the summons on any appropriate ground.
 
 V.
 
 45
 Accordingly, for the reasons heretofore stated, the judgment of the district court will be vacated, and the cause remanded for additional proceedings consistent with the foregoing.
 
 
 46
 Each side to pay its own costs.
 
 
 47
 ADAMS, Circuit Judge, dissenting, with whom SEITZ, Chief Judge, and Judges ROSENN and A. LEON HIGGINBOTHAM, Jr., Circuit Judges, join.
 
 
 48
 The majority have set forth the background of this case in some detail, and I shall not repeat it. Rather, I shall delineate what I believe are the salient facts in this dispute.
 
 
 49
 On April 27, 1979, Wheeling-Pittsburgh Steel Corporation issued its Report on the Annual Meeting of Stockholders. In the Report the company stated (1) that it had received "commitments" from two federal agencies for loan guarantees of $140,000,000, which would assist it in obtaining loans for the construction of a mill to produce steel rails; and (2) that it was "exploring future acquisitions" that had been proposed to it.
 
 
 50
 At a hearing before members of the Senate Committee on Appropriations on the question of loan guarantees, Senator Weicker confronted Mr. Carney, the President of Wheeling-Pittsburgh, about use of the word "commitments" in the Report. Inasmuch as the relevant federal agencies had not, in fact, issued commitments for loan guarantees when the Annual Report was released, Senator Weicker believed that the statements by Wheeling-Pittsburgh might constitute a material misrepresentation of fact in violation of § 10(b) of the Securities Act. The Senator referred the matter to the Securities and Exchange Commission.
 
 
 51
 The Commission undertook an investigation of whether Wheeling-Pittsburgh and Mr. Carney had violated § 10(b) and Rule 10b-5 by placing in the Annual Report the statements concerning "commitments" and "future acquisitions." Although the interrogation of Mr. Carney by the Senate had supplied the basic information regarding the allegedly improper use of the term "commitments," Mr. Carney had not been questioned there about his statements that Wheeling-Pittsburgh had received acquisition proposals. The SEC was aware, however, that the price of Wheeling-Pittsburgh common stock had doubled during the six or seven months preceding the April announcement about possible combinations involving the company (App. at 34, 699). The SEC sought informally to obtain information regarding the alleged merger offers, in order to ascertain whether those persons engaged in the heavy trading of Wheeling-Pittsburgh stock possessed information not available to the general public. But Wheeling-Pittsburgh refused to supply the requested information voluntarily. The SEC then secured a subpoena to obtain the necessary information. Wheeling-Pittsburgh continued to refuse to disclose the alleged merger offers, even on an in camera basis, and instituted suit to enjoin the subpoena. The SEC filed a complaint seeking to enforce the subpoena.[1]
 
 
 52
 The district court conducted a four-day hearing on whether the SEC subpoena should be enforced. At the conclusion of the hearing it found that (1) the SEC had acted in "good faith" in initiating the investigation of Wheeling-Pittsburgh's alleged violation of § 10(b)(5), but (2) the SEC had permitted an abuse of its investigatory function. Based on this latter determination, the district court quashed the subpoena.
 
 
 53
 In considering the Commission's appeal, we do well to remind ourselves what is not at issue in this proceeding. First, there is no question of the legality of the Commission's investigation of Wheeling-Pittsburgh's alleged violation of the securities laws, or of the relevancy of the subpoenaed documents to the Commission's inquiry. The district court found the information and materials the Commission seeks relevant to two distinct and lawful purposes: (1) to a determination whether Mr. Carney's statement in the Annual Report concerning "commitments" constituted material misrepresentation under § 10(b) and Rule 10b-5; and (2) to a determination whether traders in Wheeling-Pittsburgh shares prior to Mr. Carney's announcement may have acted on inside information relating to potential combinations between Wheeling-Pittsburgh and other entities. Wheeling-Pittsburgh does not challenge these findings. And while the majority repeatedly refer to the district judge's labeling as "patently frivolous" the charge that Mr. Carney violated Rule 10b-5 by using the word "commitments," the district court's comment in this regard is dictum, for the merits of the charges were not before that court. Moreover, the district court ventured no similar comment concerning the charges of insider trading and these, rather than the potential Rule 10b-5 violations, are the charges which cannot be investigated so long as Wheeling-Pittsburgh refuses to comply with the SEC subpoena. Indeed, it is difficult to understand how these charges may be denominated either frivolous or meritorious until Wheeling-Pittsburgh reveals what exchanges it had with other corporations about possible combinations. Only then can it be known what information may have been possessed by company insiders.
 
 
 54
 Second, the district court made findings regarding the good faith of the SEC. Although Wheeling-Pittsburgh alleged that the Commission had not undertaken its investigation in good faith, the district court found that "there is no substantial evidence to support the contention" that the agency's motivations were improper. The court noted that a plaintiff who alleges bad faith carries a "heavy burden," and concluded "(t)hat burden has not been met in this case." This critical finding, like those concerning relevancy and purpose, is not challenged by Wheeling-Pittsburgh.
 
 
 55
 The question before us, then, is whether we may uphold a district court's refusal to enforce an agency subpoena that seeks information relevant to an investigation conducted in good faith and pursuant to a statutory purpose. The majority conclude that such an investigation by the appropriate federal agency may be blocked. They assert that " 'bad faith' action by the agency represents but one ground for denying the enforcement request," and posit that enforcement is properly denied if, despite its good faith, the agency is attempting "an abuse of the judicial process." I believe, on the other hand, that the Supreme Court decisions on enforcement of agency subpoenas leave no room for an "abuse of the judicial process" theory independent of the bad faith defense.
 
 
 56
 In United States v. Powell, 379 U.S. 48, 58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1964), the Supreme Court indicated that enforcement of an agency subpoena should be denied when the agency does not pursue an investigation in good faith:
 
 
 57
 It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused. Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation.
 
 
 58
 The Supreme Court addressed the issue of enforcement of administrative subpoenas more directly in United States v. LaSalle National Bank, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1977). LaSalle National Bank had refused to obey a summons issued by the Internal Revenue Service[2] on the ground that the Service requested the information in order to advance its criminal investigation of a third party. Among the prerequisites for enforcement of an IRS summons, the Supreme Court identified the requirement that the agency "must at all times use the summons authority in good-faith pursuit of the congressionally authorized purposes" of the Act. The Supreme Court made clear, moreover, that the good faith of the agency as an institution, rather than the personal intent of any particular agency employee, determines whether a summons should be enforced. Id. at 315-16, 98 S.Ct. at 2366-2367.
 
 
 59
 The majority today read Powell and LaSalle National Bank as countenancing a broad discretion in the district courts to refuse enforcement of administrative summonses. Pointing to the Supreme Court's statements in LaSalle National Bank that the requirements for enforcement announced therein "are not intended to be exclusive," and that "(f)uture cases may well reveal the need to prevent other forms of agency abuse of congressional authority and judicial process," 437 U.S. at 318 n.20, 98 S.Ct. at 2368 n.20, the majority conclude that the Supreme Court has vested in the trial courts discretion to decline to enforce agency subpoenas even when the agency is conducting its investigation in good faith. In particular, the majority assume, without the citation of any authority, that the Supreme Court has left open the door for district courts to consider whether, notwithstanding the bona fides of the agency, enforcement of the summons would constitute an abuse of the judicial process.
 
 
 60
 I do not interpret Powell and LaSalle National Bank as authorizing so wide-ranging an inquiry, however. The majority overlook the Supreme Court's explicit statement in LaSalle National Bank that, at least so long as the agency investigation is statutorily authorized and the information sought relevant, the agency's good or bad faith determines whether its summons must be obeyed: "The dispositive question in each case, then, is whether the (agency) is pursuing the authorized purposes in good faith." 437 U.S. at 317 n.19, 98 S.Ct. at 2368 n.19. (emphasis added). While the Supreme Court left open the possibility of future development of the law on enforcement, I believe that in doing so it recognized the need for future refinements of the concept of good faith. Thus the Court commented that the indications in Powell that a summons is issued for an improper purpose when intended to harass or to induce settlement of a collateral dispute "were not intended as an exclusive statement about the meaning of good faith. They were examples of agency action not in good-faith pursuit of the congressionally authorized purposes of § 7602." Id. (emphasis supplied). I do not understand the Supreme Court to have authorized district court refusals to enforce administrative subpoenas issued in good faith pursuit of a statutorily authorized purpose.[3]
 
 
 61
 A panel of this Court had occasion to examine the issues surrounding enforcement of administrative summonses earlier last term in United States v. Cortese, 614 F.2d 914 (3d Cir. 1980).[4] The district court in Cortese had declined to enforce an IRS summons on the ground that the Service's investigation was not conducted in good faith. In so finding, the district court had focused on the effect that an informant's motive had on the Service's purpose in issuing the summons, concluding that a biased informant had used the Service, with its knowledge, in order to retaliate against the subjects of the investigation. We reversed, holding that the motivations of third parties should have no bearing on the question of agency good faith:
 
 
 62
 We agree with appellant that the motive of an informant is not a relevant consideration in determining good faith. Despite its conclusion, the district court recognized that informants "have historically been known to hold grudges against those who are the subject matter of the information." Informants traditionally act in their own interest. It is a rare informant who is not interested in "pursuing his own purposes." The motive of the informant does not taint the motive of the IRS.
 
 614 F.2d at 921.[5]
 
 63
 The majority today profess to adhere to Cortese, and several times reiterate the teaching of Cortese that a court asked to enforce a subpoena must focus on the motivations of the agency rather than those of third-party informants. But I fail to see how Wheeling-Pittsburgh can avail itself of the "abuse of process" defense embraced by the majority without alluding to the motivations of those persons who informed the SEC of the company's possible wrongdoing. The majority recognize that investigations brought in bad faith i. e., brought without "a reasonable expectation of obtaining a valid conviction," Kugler v. Helfant, 421 U.S. 117, 126 n.6, 95 S.Ct. 1524, 1531-1532 n.6 44 L.Ed.2d 15 (1975) will constitute the larger number of cases in which an agency seeks to "abuse the process" of the courts. But the majority do not describe a case in which enforcement would result in an "abuse of the judicial process," even though the agency pursued its investigation in good faith. Instead, the majority's suggestions concerning what would be evidence of abuse of process describe just as well agency bad faith: agency pursuit of a claim it knows it cannot win, investigations instigated by a powerful United States Senator with no reasonable expectation of success, pursuit of a claim when the agency has not ascertained the likelihood of a conviction. In the present case, however, further inquiry into these issues is unnecessary. We already have the specific finding of the district court, unchallenged on appeal, that Wheeling-Pittsburgh has introduced no substantial evidence to show that the Commission's motivations in conducting its investigations were improper. The district court's finding that, despite agency good faith, the court's process was being abused can be understood, in my view, as reflecting an undue deference to what Wheeling-Pittsburgh alleged to be the improper motivations of the third-party informants. The district court's consideration of third-party motives is evidenced by its explicit rejection of the Commission's argument that "the motivations of persons with whom the SEC has had contact concerning the investigation are simply irrelevant."
 
 
 64
 In my view, the majority's "abuse of process" defense is either superfluous or incorrect. If "abuse of process" amounts to nothing more than consideration of the bona fides of the agency, then the defense is redundant with the "bad faith" defense the Supreme Court recognized in Powell and LaSalle National Bank ; moreover, I believe that the district court's unchallenged finding of the Commission's good faith makes further inquiry into this issue unnecessary. If, however, the majority intend to extend inquiry beyond the good faith of the agency, then I perceive, and the majority suggest, no alternative to examination of the motivations and conduct of third-party informants. But such inquiry, in my opinion, would unduly encroach on the domain of the executive and legislative branches of the government. It would also conflict with the teaching of Cortese.
 
 
 65
 Moreover, today's decision threatens to cause further delays in a system already beset with delay. The majority concede that in many instances the information that leads to investigation is furnished to a government agency by disgruntled citizens, competitors, or others actuated by less than altruistic motives. If the target of an agency investigation may resist enforcement of a subpoena whenever there is cause to believe that the agency received information from a competitor or from a Congressman acting on behalf of a constituent, resistance to investigations may well become the order of the day. We can expect repeated efforts to derail investigations even though it appears quite strongly that the investigated party has transgressed federal law.
 
 
 66
 I recognize, of course, the potential danger presented when members of Congress or the Executive Branch suggest that an enforcement agency undertake an investigation. If, for example, the head of an agency wishes to harass a former political or personal opponent by conducting an investigation, such conduct should not be approved. See United States v. Fensterwald, 553 F.2d 231 (D.C.Cir.1977) (per curiam). But not every investigative referral by a Congressman or other official should be considered suspect or condemned per se. The Supreme Court recognized in Gravel v. United States, 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d 583 (1972), that members of Congress "are constantly in touch with the Executive Branch of Government they may cajole, and exhort with respect to the administration of a federal statute." And one commentator, addressing congressional oversight of administrative enforcement, has remarked that "most of these actions seem well within the constitutional authority of congressional committees and individual congressmen." Parnell, Congressional Interference in Agency Enforcement: The IRS Experience, 89 Yale L.J. 1360, 1368 (1980). See also Comment, Judicial Limitation of Congressional Influence on Administrative Agencies, 73 N.U.L.Rev. 931, 937-45 (1978).
 
 
 67
 Because I believe that the procedures the majority adopt today go beyond the guidelines fashioned by the Supreme Court, and indeed beyond the policy this Court set forth only recently in Cortese, and because I believe the majority result will serve to frustrate many future investigations of violations of federal law, I respectfully dissent.
 
 
 
 *
 Honorable Joseph S. Lord, III, Chief Judge of the United States District Court for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 W-P has advised the court that as of the time of oral argument it has completed one EDA guaranteed borrowing in the amount of $30,989,940 for rail mill construction and two EDA guaranteed borrowings for pollution control installations in the amount of $13,495,285. One FmHA guaranteed loan for $6 million has been consummated. Letter from Paul A. Manion, counsel for W-P, to the court (Nov. 24, 1980)
 
 
 [2]
 Senator Weicker's Amendment No. 273 provided:
 None of the funds provided in this Act shall be available for a new loan or guarantee under the Economic Development Revolving Fund to any corporation which is the subject of an investigation by the Securities and Exchange Commission.
 
 
 [3]
 See App. at 225-26. The reason for Senator Weicker's peculiar interest in this Pennsylvania-based steel company is not clear. W-P has alleged that Thomas Mellon Evans, the chairman of Crane Co., parent company of CF&I, is a neighbor and acquaintance of Senator Weicker. See Answer and Counterclaim for W-P at 7, P 5
 
 
 [4]
 See, e. g., transcript of oral argument at 5
 
 
 [5]
 We assume, as do the parties, that the same standards are applicable to enforcement of SEC subpoenas as Internal Revenue Service summonses. Thus, the subpoena issued by the Securities and Exchange Commission, 15 U.S.C. § 78u, like the administrative subpoena issued by the Federal Trade Commission, 15 U.S.C. § 49, and the Interstate Commerce Commission, 49 U.S.C. § 20 P 6, as well as the administrative summons issued under § 7602 of the Internal Revenue Code, I.R.C. § 7602, is subject to the same judicial scrutiny prior to enforcement
 
 
 [6]
 In Brimson, the Court stated: "The inquiry whether a witness before the Commission is bound to answer a particular question propounded to him, or to produce books, papers, etc., in his possession and called for by that body, is one that cannot be committed to a subordinate administrative or executive tribunal for final determination." 154 U.S. at 485, 14 S.Ct. at 1136
 
 
 [7]
 United States v. LaSalle National Bank, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978); United States v. Bisceglia, 420 U.S. 141, 95 S.Ct. 915, 43 L.Ed.2d 88 (1975); Donaldson v. United States, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971); Ryan v. United States, 379 U.S. 61, 85 S.Ct. 232, 13 L.Ed.2d 122 (1964); United States v. Powell, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964); Reisman v. Caplin, 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964)
 
 
 [8]
 This court has previously acknowledged these statements. United States v. Garden State Nat'l Bank, 607 F.2d 61, 69 (3d Cir. 1979)
 
 
 [9]
 The distinction between agency bad faith and the agency acquiescence in an abuse of its process leading to an abuse of the court's process, though subtle, is significant. "Bad faith" connotes a conscious decision by an agency to pursue a groundless allegation without hope of proving that allegation. See part II B infra. In contrast, an agency could be found to be abusing the court's process if it vigorously pursued a charge because of the influence of a powerful third party without consciously and objectively evaluating the charge. See 17 C.F.R. § 202.5(a) (1980)
 
 
 [10]
 Parnell's major concern is the public action of Congress in frustrating the enforcement activities of the Internal Revenue Service, but the concerns he expresses are equally applicable to private communications between individual congressmen and administrative agencies
 
 
 [11]
 The internal rules promulgated by the SEC for itself state a procedure for staff contacts with governmental authorities:
 (T)he Commission approves the practice whereby officials of the Division of Enforcement at the level of Assistant Director or higher, and officials in Regional Offices at the level of Assistant Regional Administrator or higher, may engage in, and may authorize members of the Commission's staff to engage in, discussions with representatives of domestic or foreign governmental authorities and self-regulatory organizations concerning information obtained in individual investigations, including examinations and formal investigations conducted pursuant to Commission order.
 
 
 [17]
 C.F.R. § 203.2 (1980)
 
 
 [12]
 See, e. g., City of Chicago v. United States, 396 U.S. 162, 165, 90 S.Ct. 309, 311, 24 L.Ed.2d 340 (1969); Union Mechling Corp. v. United States, 566 F.2d 722, 724-25 (D.C.Cir.1977); SEC v. Howatt, 525 F.2d 226, 229 (1st Cir. 1975); Kixmiller v. SEC, 492 F.2d 641, 645 (D.C.Cir.1974) (per curiam); SEC v. Brigadoon Scotch Distrib. Co., 480 F.2d 1047, 1052-53 (2d Cir. 1973), cert. denied, 415 U.S. 915, 94 S.Ct. 1410, 39 L.Ed.2d 469 (1974); Leighton v. SEC, 221 F.2d 91, 91-92 (D.C.Cir.1955) (per curiam). The reason for this policy of non-interference was recently stated by the fifth circuit: "Judicial supervision of agency decisions to investigate might hopelessly entangle the courts in areas that would prove to be unmanageable and would certainly throw great amounts of sand into the gears of the administrative process." Dresser Industries, Inc. v. United States, 596 F.2d 1231, 1235 n.1 (5th Cir. 1979), cert. denied, 444 U.S. 1044, 100 S.Ct. 731, 62 L.Ed.2d 730 (1980)
 
 
 [13]
 The Supreme Court has recently reserved decision on whether issuance of a complaint "solely by reason of outside pressure or with complete absence of a 'reason to believe' determination" would be grounds for dismissing an administrative complaint. FTC v. Standard Oil Company of California, -- U.S. --, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980). The Court reversed the ninth circuit's judgment ordering the complaint dismissed, holding that the issuance of a complaint is not "final agency action" subject to review under the Administrative Procedure Act, 5 U.S.C. § 704. In this case, of course, federal jurisdiction arises under § 21(b) of the Securities Exchange Act, 15 U.S.C. § 78u(b), and the lack of finality of the SEC's action in issuing the complaint is not a bar to our jurisdiction
 
 
 [1]
 The two cases were later consolidated, and Wheeling's injunctive action was dismissed, since Wheeling could raise its objections to the subpoena as defenses to the Commission's enforcement action
 
 
 [2]
 The summons was issued under Section 7602, which provides that "(f)or the purpose of ascertaining the correctness of any return, the Secretary or his delegate is authorized (t)o summon the person liable for tax to appear before the Secretary or his delegate at a time and place named in the summons and to produce books, papers, records, or other data and (t)o take such testimony of the person concerned, under oath, as may be relevant to such inquiry."
 
 
 [3]
 See also Developments in the Law Corporate Crime: Regulating Corporate Behavior Through Criminal Sanctions, 92 Harv.L.Rev. 1227, 1325 (1979) (after LaSalle National Bank, "(i)n order to block enforcement (of an IRS summons), the taxpayer must show that the IRS as an institution has abandoned the (statutory purpose of determining) civil tax liability")
 It might be noted that the constitutional concerns lurking in LaSalle National Bank do not affect the present case. In LaSalle there was a risk that the Fifth Amendment provision against self-incrimination might be abridged if an IRS civil summons could be used to obtain information for use in a criminal investigation. The Court averted this problem by reaffirming the "prophylactic rule" that a civil summons may not issue once the IRS has referred a tax case to the Justice Department. 437 U.S. at 308-13, 98 S.Ct. at 2363-2366. In contrast, the disclosure by Wheeling-Pittsburgh of the information sought by the SEC presents no constitutional problems. When the safeguarding of constitutional rights is not in issue, it does not appear wise to fashion what is, in effect, an exclusionary rule, by immunizing an alleged violation of federal law from investigation based on the possible wrongdoing, not of the agency itself, but of the third parties who alerted the agency to potential violations.
 
 
 [4]
 Cortese was decided on February 8, 1980, almost two months after the district court's decision in the case before us
 
 
 [5]
 Judge Garth, concurring in Cortese, objected to the majority's statement that a finding of bad faith would be appropriate if the agency had adopted the nefarious motives of an informant. He noted that the case before the Court did not raise this issue, and that the Court was not obliged to rule out the possibility that, even under these circumstances, the agency might act in good faith